LINEBARGER *v.* LATE.

4-8658                                          216 S. W. 2d 56

Opinion delivered December 13, 1948.

Rehearing denied January 24, 1949.

*Ulys A. Lovell* and *Charles Mehaffy*, for appellant.

*Rex W. Perkins* and *G. T. Sullins*, for appellee.

GRIFFIN SMITH, Chief Justice.  The question is whether, after fifteen years of seeming neglect to assert a claim now contended for, John N. Late can prevail in

respect of a half interest in the net proceeds of realty sold by W. E. Linebarger to Neil Sawrey.[1]

Prior to 1930 Late owned a lot in Springdale on which there was a residence. An oil company bought the land for $10,000 under an agreement that the building would be removed. Dr. J. E. Martin owned a nearby homesite and agreed with Late that the house be placed upon Martin's property. Martin, in turn, arranged for Linebarger, as contractor, to effectuate the physical transaction, the two to jointly own a half interest, with Late owning the other half.

In March or April of 1930 the house was taken to the new location at a removal and repair cost of $1,000. Late thought the Martin lot was worth from $350 to $500 and that the old house had a value of $2,500. It was rented to Dr. Aubrey Smith and occupied by him from May 1930 until Linebarger sold to Sawrey in May 1944. Smith attorned to Linebarger in sums varying from $15 per month, $17.50, $20, and $25 for the last year. There was no suggestion during this period that Linebarger was not the sole owner.

Dr. Martin died December 22, 1930. His wife, as administratrix, was assisted by a son of the couple, William T. Martin, who in testifying by deposition on November 1947, said that he was a professor of mathematics, heading that department at Massachusetts Institute of Technology. Among Dr. Martin's effects was an account book evidencing, in part, the Martin-Late transaction, the entry being: "May 1, 1930. To moving house across street and deeding one-half interest to John Late from Linebarger and Martin—cost of moving and repairing, $1,100. This is bearing 8% from date, the rent to be applied in payment of this amount." Various entries to December 2, 1930, are shown, with a final balance of $1,145.62. A photostatic copy of the ledger page was introduced by attorneys for Late, with the explanation, "I am introducing it for what it reads: nobody in the world could understand what it meant—noboby but Dr. Martin could tell."

---

[1] Linebarger and his wife joined in a deed to Neil and Nola Sawrey, husband and wife.

Appellee emphatically denied any agreement to pay half the cost of removal and repairs. To the contrary, he testified that the house was the full measure of his contribution, to be taken as it stood on the original foundation. All conversations relating to the deal were with Dr. Martin, who said, ''I have got that lot and I will pay for moving the house over on my land and put it in shape and we will go fifty-fifty on the house: why can't we make a trade.'' Two witnesses testified in support of this conversation.

In his brief, however, appellee says (regarding the ledger account) ''it shows that $1,100 was loaned, bearing eight percent interest, to be repaid from rents.'' The Chancellor found that the $1,100 represented cost of moving and making repairs, and that Late was obligated for half of it. A further finding was that the widow and heirs of Dr. Martin conveyed their interests to Linebarger; that by virtue of the original contract Dr. Martin, Linebarger, and Late became tenants in common, and that after charging Linebarger with the sale price of $4,200 and $3,345 taken in as rents, and crediting him with taxes, special assessments, insurance, and other allowables, all amounting to $3,078.05, and adding $1,145, the difference was $3,112. Half of this, or $1,556, belonged to Late, with interest from August 30, 1944, (date of the sale) or a total of $1,867.20, for which judgment was rendered.

The proof shows that a deed was executed by Linebarger and Martin, and their wives, by which a half interest in the property would have been conveyed to Late. Dr. Martin took the deed, presumptively to deliver it to Late. But the grantee testified that during his absence the document and bill for $1,100 were left on his desk. After testifying that he did not see either Martin or Linebarger at the time the deed was brought to his office, Late asserted that ''. . . they brought it to my office and stated that Linebarger wanted me to pay for half of the expense.'' There is this additional, but significant, statement: ''They brought the deed to my office, but when we moved to where we are now the deed got misplaced.''

The deed was introduced by Linebarger, who testified that immediately after its execution Dr. Martin left to give it to Late, "but brought it back and gave it to me. I put it in the box at the bank and [from that time on] had not seen it until a few days ago. Late would not have it, so Dr. Martin brought it back."

In his deposition William T. Martin said the ledger page was in his father's writing, other than the notation "Deed in Elmer [Linebarger's] hands." This was added by the witness, who first discussed with Late the matters in controversy at an attempted conference during the summer of 1931. Request for payment was made so a deed could be delivered; but Late refused to talk about settlement, saying "I am not interested even in discussing it further." There was never a denial of the account, nor was any item questioned:—"Payment of the balance and tender of the deed were [both] refused. . . . From the time of my father's death on my mother and I and Linebarger exercised all of the indicia of ownership, to the exclusion of J. N. Late." This statement was modified by the explanation appellants' adverse claims dated from Late's refusal to pay his half of the eleven hundred dollars. Thereafter Linebarger claimed half and the Martins thought they owned the other half.

In his brief appellee does not question correctness of the Chancellor's holding that the plaintiff below was bound for half the removal-repairs cost, for he says: ". . . In view of this record . . . there appears to be no other satisfactory explanation or testimony." But the obligation is treated as a loan—a relationship that could not exist if appellee's testimony is credited; nor is there substance for a factual finding that appellee's memory was accurate when he asserted that deed and statement of account were left at his office "and lost when I moved." The deed was in Linebarger's possession. A preponderance of the evidence, including inferences arising from circumstances and conduct, negatives the claim of manual delivery or mutuality of purpose.

After Late, according to his own testimony, had refused to pay any part of the disputed bill, and after

he had disclaimed sufficient interest in the property (if William T. Martin is correct) to justify a conversation, Late stood mute, inactive, and seemingly disinterested for approximately fourteen years after final effort had been made to deliver the deed. During this unreasonably long period, the only concern even claimed by Late to have been translated into action was his "observation" every day or two while walking by the place "to see that *they* were keeping it up."

Martin and Linebarger initially, and later Linebarger alone, paid all taxes, special assessments, insurance premiums, repair bills, and other expenses; and they collected rentals as though the property belonged to them. Mrs. Dora F. Martin, the Doctor's widow, testified she had called at Late's place of business in an effort to "trade cars," and had also been a guest in his home. No mention was made of the property or interest. The inheritance tax settlement incident to Dr. Martin's estate was paid through Mrs. Martin, without mention of anything Late now contends for.

Where property is held in joint tenancy, the possession of one is deemed to be conjunctive with others, hence there is mutuality of seizen; and this status presumptively continues until some affirmative act by the joint tenant who holds for all is of such a nature as to warn other proprietors that the status has shifted from mutuality to hostility. This may be done in so many ways that judges and text-writers have not undertaken an enumeration. What in one case would be sufficient as a warning might not be enough in another. Relationship of the parties, their reasonable access to the property and opportunity or necessity for dealing with it, their right to rely upon conduct and assurances of the tenant in possession, kinship, business transactions directly or incidentally touching the primary subject-matter, silence when one should have spoken, natural inferences arising from indifference—these and other means of conveying or concealing intent may be important in a particular case, but not controlling in another; for after all what a designated plaintiff or defendant had in mind when he or she consummated an act or engaged in a course of

conduct often depends upon the personal equation and the individual's method of expression. There can, therefore, be no "open and shut" rule by which purpose can be measured.

These difficulties were discussed in *Jones* v. *Morgan*, 196 Ark. 1153, 121 S. W. 2d 96, where it was said that co-tenancy may be held to have terminated seven years after the hostile attitude of the adverse claimant was brought to the attention of others. In the opinion it was said: "There is no testimony that Morgan ever said to his sister or brothers, or to those claiming through them, 'I am claiming this land as my own; I deny your interest in it; take notice of my attitude.' Nothing of this kind occurred; and yet, for more than thirty years, his conduct, his situation, and his actions in dealings affecting the property, were tantamount to a declaration of hostility to the claims of all persons—and all 'persons' included those descending from the Morgans."

The Chancellor correctly found that by the contract between Dr. Martin and Late the house was to be moved and put in habitable condition at joint expense, and thereafter Late would have a half interest. A duty of trust rested upon Dr. Martin to protect this interest. Had he refused to execute a deed, equity would have compelled it; nor, in ordinary circumstances, would time have altered this obligation while performance was wrongfully withheld.

Having determined that Late was bound for half of eleven hundred dollars, it follows that this sum was due on demand, or within a reasonable period. Nondelivery of the deed was not a delinquency chargeable to Dr. Martin. He had a right to retain it until Late had performed; or, conversely the two could have agreed (as might be inferred from the ledger indorsements) that credit against half the rents had been extended. But Late says this is not true, and in effect he hazards success upon proof that the deed was left in his office and was subsequently lost through carelessness. A decided preponderance of the evidence shows otherwise.

Dr. Smith's wife, as tenant, gave testimony indicating that value of the property was moderate. Large

plaster areas were loosened when the house was taken from its original foundation, and the plaster later fell. The roof was poor and continued to leak. Linebarger testified that if he had made a personal inspection before agreeing with Dr. Martin, then the partnership would have failed because the building was not worth moving. Other witnesses held opposite views.

We find nothing in William T. Martin's testimony subjecting it to disbelief, although Late said the matters mentioned were not discussed—in fact, that the conversations did not occur.

We have judicial knowledge that 1930 and the years immediately following were periods of economic stress when property values generally were adversely affected. We do not judicially know that in a particular place, at a certain time, and in respect of identified persons, the depression affected their actions or property. But a factual finding that an obligation was incurred in 1930 and not discharged might imply (a) that Late wrongfully interpreted his contract and erroneously refused settlement; (b) in disregard of the obligation he willfully refused to pay; (c) he was unable to pay and arbitrarily declined to say so; (d) after inspecting the property in its renovated condition he thought a half interest not worth the cost and abandoned it; or, (e) he concluded to stand on the claim of interest without further obligation and misled Mrs. Martin, the heirs, and Linebarger.

In view (1) of information Late is bound to have had regarding use of the property; (2) of its inclusion as a part of Dr. Martin's estate when inheritance tax settlement was made—a circumstance only, and not of controlling importance; (3) of delay for fourteen years in protesting assessments made, *prima facie,* in a manner alien to Late's claim; (4) of his unsatisfactory explanation of the deed; and (5) of his act in affirmatively assuring William T. Martin that the interest was not worth discussing—these things, coupled with other conduct, disclosed a purpose of speculative waiting with an undisclosed reservation that if values substantially increased within a reasonable time, then the demand for proportionate payment would be litigated, compromised, or

waived; but otherwise the enterprise would be abandoned. This compelled the Martins and Linebarger to pay $1,100 for an old house they never intended to buy at that price.

It follows that the decree must be reversed. Directions are that the cause be dismissed.