R. T. UELTZEN ET AL *v.* BILLY ROE AND NEVA ROE SOWL

5-4121                                          411 S. W. 2d 894

Opinion delivered February 27, 1967

*David O. Partain,* for appellant.

*Batchelor & Batchelor,* for appellee.

LYLE BROWN, Justice. This is a suit to quiet title brought by plaintiffs-appellees, Billy Roe and Neva Roe Sowl, brother and sister. They brought suit against the six brothers and sisters of their mother, Maude Roe. Basing his findings on adverse possession, estoppel, and laches, the trial court vested title in appellees. Appellants contend, first, that the Roe family failed to establish hostile possession, and, second, that no notice of adverse claim was ever brought home to appellants.

Here is the opinion of the trial court. It sets out the issues with clarity and of course states the factual conclusions, together with the law found to be applicable:

## OPINION

The land in controversy, a farm of about 277 acres lying southeast of the town of Graphic in Crawford County, Arkansas, was owned by Laura and R. R. Ueltzen, wife and husband, prior to 1900. To this union six children were born, namely, Maude Roe, plaintiffs' mother, R. T. Ueltzen, Onenta Ward, W. R. Ueltzen, Chloe Durham, and Mae Henzig. Defendant, Emma Cash, is a daughter of R. R. Ueltzen by a former marriage.

This family lived on the property until about 1913 or 1914, when R. R. Ueltzen sold all his personal property and moved to Oklahoma with his family. What happened to the property from then until Maude Roe took possession and raised her family there is not clear. R. R. Ueltzen died, seized and possessed of this land about 1925 or 1926; and his wife, Laura, continued to live in Oklahoma. In 1929 this property went delinquent and was sold for nonpayment of real estate taxes. At this time, plaintiffs and their mother were living on ''Grant Farm'' on Highway 64 east of Mulberry. During the time the property was in possession of persons under the tax forfeiture, all improvements were destroyed.

On April 3, 1934, Maude Roe obtained a Redemption Deed from the State of Arkansas to this property and apparently went into possession. Here the testimony is in conflict. Plaintiffs testified that Mrs. Roe contacted her mother, Laura, and her brothers and sisters in Oklahoma, requesting them to contribute to the amount of money necessary to redeem the land; but they refused and agreed with their mother, Maude Roe, that if she would redeem the property herself, she could have it as her own property. To corroborate this testimony, Amos Watkins testified that he was an old friend of the family and about two or three years ago he met Billy Roe and R. T. Ueltzen at the store at Graphic and in the conversation asked R. T. Ueltzen what had happened to the old home place, and he stated to him [Watkins] that he and his brothers and sisters had given the property to their sister, Maude Roe. This is denied by the defendant, R. T. Ueltzen, and by Mae Henzig, who testified that they had not given the property to Maude Roe, but had agreed that Mrs. Roe put up the money and redeem the property in lieu of rent.

Laura Ueltzen died intestate in Oklahoma about 1936 or 1937.

Maude Roe and her husband, shortly after 1934,

moved into an old log cabin on the place, daubed the cracks with clay, and raised their family there.

Between 1934 and 1940, plaintiffs' father built a log share cropper's house some distance west of the log cabin where they lived. Plaintiff Sowl later lived in this house.

About 1942, plaintiffs and their parents built a frame farm home upon this land, which was still farther west of the old log home and on the county road. They also built a barn.

From April 1934 to about 1947, the year plaintiffs' father died, the Roes had cut from this land all merchantable timber, farmed the land for their living, keeping and using all benefits from the land.

About 1947, plaintiff Billy Roe built a two-room home on the land in controversy.

Plaintiffs testified, and the defendants did not deny, that they visited from time to time in all of these homes, spent nights there, and knew of the making of all improvements to which they did not contribute anything or claim any benefits from the farm.

On June 15, 1956, plaintiffs' mother, Maude Roe, executed and delivered to Billy Roe and Neva Roe Sowl a warranty deed to all of said property, which deed was duly recorded shortly thereafter. About two years later, Maude Roe died, intestate.

In the latter part of 1957, Billy Roe constructed a new frame farm home on the land, where he now lives.

Plaintiffs' mother, Maude Roe, paid all taxes upon the land in controversy for the years 1933 to 1955, inclusive, and plaintiffs have paid the taxes for the years 1956 through 1964.

Plaintiffs and defendants are tenants in common. Plaintiffs claim title to the entire tract by adverse pos-

session. It must be remembered at the outset that the possession of one tenant in common is the possession of all tenants. *Franklin* v. *Hempstead County Hunting Club*, 216 Ark. 927, 228 S. W. 2d 65; *Ashley* v. *Garrett*, 218 Ark. 126, 234 S. W. 2d 513; *Woolfolk* v. *McDonnell*, 215 Ark. 34, 219 S. W. 2d 223; *Gibbs* v. *Pace*, 207 Ark. 199, 179 S. W. 2d 690. And, further, in view of the family relation stronger evidence of adverse possession is required than in the case where no such relation exists. *McGuire* v. *Wallis*, 231 Ark. 506, 330 S. W. 2d 714; *Staggs* v. *Story*, 220 Ark. 823, 250 S. W. 2d 125; *Baxter* v. *Young*, 229 Ark. 1035, 320 S. W. 2d 640.

It is also well established that in order for the possession of a tenant in common to be adverse it is incumbent upon him to bring home to his cotenants knowledge of his hostile claim, either directly or by acts so notorious and unequivocal that notice must be presumed. *McGuire* v. *Wallis, supra*; *Hildreth* v. *Hildreth*, 210 Ark. 342, 196 S. W. 2d 353; *Smith* v. *Kappler*, 220 Ark. 10, 245 S. W. 2d 809.

The court is faced with a difficult problem indeed. For as the court said in *Linebarger* v. *Late*, 214 Ark. 278, at p. 282, 216 S. W. 2d 56:

"Where property is held in joint tenancy, the possession of one is deemed to be conjunctive with others, hence there is mutuality of seisin; and this status presumptively continues until some affirmative act by the joint tenant who holds for all is of such a nature as to warn other proprietors that the status has shifted from mutuality to hostility. This may be done in so many ways that judges and text writers have not undertaken an enumeration. What in one case would be sufficient as a warning might not be enough in another. Relationship of the parties, their reasonable access to the property and opportunity or necessity for dealing with it, their right to rely upon conduct and assurances of the

tenant in possession, kinship, business transactions directly or incidentally touching the primary subject matter, silence when one should have spoken, natural inferences arising from indifference—these and other means of conveying or concealing intent may be important in a particular case, but not controlling in another; for after all what a designated plaintiff or defendant had in mind when he or she consummated an act or engaged in a course of conduct often depends upon the personal equation and the individual's method of expression. There can, therefore, be no 'open and shut' rule by which purpose can be measured.''

In order to arrive at a correct solution, it is necessary to look at the evidence as a whole using as a yardstick the rules above set forth.

In the cited case of *Linebarger* v. *Late,* decided in 1948, the court took judicial knowledge that 1930 and the years immediately following were periods of economic stress when property values generally were adversely affected. The testimony that Maude Roe tried unsuccessfully to get her mother, brothers, and sisters to contribute to the fund necessary to redeem this land, coupled with the testimony of Amos Watkins to the effect that R. T. Ueltzen told him that he and his brothers and sisters had given the old home place to Maude Roe, compels the court to consider this as a circumstance in the chain of events creating a natural inference of indifference on their part. In 1934 money was scarce and it is unbelievable that Maude Roe would have raised the money alone to redeem this land for the meager future rent from a farm unimproved and at a time when there was no market for products from the operation of such a farm.

The tax deed was recorded. It is fair to say that the defendants knew of the execution and recording of this deed. To establish adverse possession against his cotenants the plaintiffs have the burden of proving eith-

er that they brought notice home to them or that their conduct was so open and unequivocal that they should have known of the hostile claim. There is no testimony that the plaintiff did in so many words say to the defendants, "We are claiming this land as our own," but the rule is in the conjunctive. So far, learned counsel for the parties have failed in their excellent briefs to cite a decision or text that defines "Such acts or conduct so unequivocal and notorious in character that notice will be presumed," and the court has found none. Possession alone is insufficient. Payment of taxes, while strong evidence of a claim of title, it alone is insufficient. So, as said before, the evidence as a whole must be examined and each case stands on its own bottom.

Significant in this case, Maude Roe, in 1956, executed a warranty deed to all of the land to plaintiffs, which deed was duly recorded. Up to this time fairly substantial improvements had been made on the land and after this deed, and more than seven years before the commencement of this action, Billy Roe built his own substantial frame home upon this property. The defendants visited in this home and the other homes and knew of these improvements.\* \* \* \*

After the entry of Billy Roe under the deed from his mother and more than seven years from that date, some oil company was about to drill for oil and gas under a lease from plaintiffs. An examiner of the abstract of title made a requirement of protective leases from the defendants. For the first time in thirty years the defendants made claim to an interest in this land.

Our courts have ordinarily held that to constitute estoppel, adverse possession or laches with reference to a cotenant, that no one or two specific acts, and sometime even more, necessarily, of themselves amount to a disseisin, but the following each are items to be considered in determining whether the possession is adverse, or the individual is estopped or guilty of laches and they include such acts as (1) possession of the

property; (2) payment of taxes; (3) enjoyment of rents and profits; (4) making of improvements (particularly of a substantial nature); (5) payments of insurance made payable to himself; (6) holding possession of lands for a long period of time, such as 30 years; (7) treating property as one's own; (8) selling timber; (9) executing leases; (10) assessment of property in one's own name; (11) selling crops; (12) the execution, delivery, and recording of a deed by one cotenant which purports to convey the entire property; and (13) generally treating property as his own. *Jones et al* v. *Morgan et al,* 196 Ark. 1153, 121 S. W. 2d 96 (1938); *Hildreth et al* v. *Hildreth,* 210 Ark. 342, 196 S. W. 2d 353 (1946); *Linebarger* v. *Late, supra; Ulrich* v. *Coleman et al,* 218 Ark. 236, 235 S. W. 2d 868 (1951); *Johnson et al* v. *James,* 237 Ark. 900, 377 S. W. 2d 44 (1964).

Laches or estoppel, is not brought into being merely by delay, but by delay that works a disadvantage to another. So long as the parties are in the same condition, it matters little whether one presses a right promptly or slowly within limits allowed by law. But where, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith become so changed that he cannot be restored to his former state, if the right be enforced, delay becomes inequitable, and operates as estoppel against the asserted right. This disadvantage may come from loss of evidence, change of title, intervention of equities, and other causes, the making of substantial improvements to the land, and other causes, for where the court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief.

Put in other terms, estoppel is merely the manner, in courts of equity, and sometimes even in courts of law, where when one party, or one group of parties sit idly by and do not speak when, in good conscience, they should speak, they will not later be heard to speak when they should in good conscience, remain silent. *Steele* v.

*Jackson,* 194 Ark. 1060, 110 S. W. 2d 1 (1937); *Line-barger* v. *Late, supra.*

Plaintiffs and their mother and father have had the exclusive and complete use, control, and possession of all of the land for more than thirty consecutive years prior to the commencement of this action. None of the defendants has been in possession of, or attempted, in any wise to exercise any dominion over, or possession of, the property during all of this time. There were no buildings or improvements on this property when it was redeemed in 1934. All improvements were made more than seven years before the commencement of this action and with full knowledge of defendants.

Plaintiffs' mother paid all taxes in her own name, in addition to the redemption, for the years 1933 to 1955, inclusive, and plaintiffs have paid taxes in their own names for the years 1956 to 1964, inclusive. Plaintiffs executed an oil and gas lease in their own names. Plaintiffs cut and sold all merchantable timber.

For all of these thirty years the defendants, while visiting and knowing that plaintiffs were making permanent and valuable improvements and doing other acts, sat idly by and made no claim until aroused by possible enrichment from the drilling of a gas well. Individuals do not slumber on their property rights for thirty years under circumstances like this.

Considering all of these factors in the aggregate, the court is convinced that plaintiffs are entitled to have their title to said property quieted in them by reason of adverse possession, estoppel, and laches.

The testimony recited by the chancellor, supplemented by a study of the entire record, reveals only one important factual issue in controversy. This concerns the circumstances surrounding entry upon the lands by Maude Roe, that is, whether she entered on the basis of an agreement with the other heirs that the place would

be hers if she would redeem it. On this point the chancellor, who had the advantage of seeing and hearing the witnesses, ruled in favor of appellees, and we certainly cannot say his findings were contrary to a preponderance of the evidence. The circumstances of the entry as found by the trial court, the silence of the aunts and uncles for three decades, together with the multitudinous acts of ownership recited in the record and undisputed, justify the factual conclusions of the chancellor.

Affirmed.

FOGLEMAN and BYRD, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. The learned trial judge's opinion contains a thorough and concise statement of the facts disclosed by this record and excellent statements of legal principles. My disagreement with him and the majority lies in what I take to be misapplication of law to the facts and their overlooking certain applicable legal and equitable principles. I am unable to distinguish this case from other decisions of this court which reached a contrary result.

The fundamental basis of appellees' claim is an alleged parol gift of the land. This is clearly alleged in the complaint and the appellees attempted to make a showing that their mother obtained a redemption deed from a tax forfeiture to the state based upon an agreement with her brothers and sisters that if she would redeem the land it would be hers. Some of appellants concede that there was an agreement but they say that it was that she could live on, use and occupy the property without payment of rent if she would pay the taxes.

Here the appellees are confronted with the requirement that they show the parol gift, not by a mere preponderance of the evidence, but by evidence that is clear, convincing and satisfactory, or, as sometimes stated, by evidence that is clear and unequivocal. *Gibbs* v. *Pace*, 207 Ark. 199, 179 S. W. 2d 690. Not only is this parol gift the fundamental basis of appellees' claim, but it is

also the foundation stone of the opinion of both the trial court and the majority that the possession of appellees was adverse and hostile to appellants.

My examination of the testimony in support of the parol gift discloses that the evidence supporting it is far from clear, convincing or satisfactory. No one testified about the gift except appellees. Appellee Roe was about 7 or 8 years old when his mother moved on the property, so he does not attempt to tell very much about the parol gift. He first said that none of his aunts and uncles ever said anything about the ownership of the property except his Uncle Will (W. R. Ueltzen). He then related that his Uncle Will had, about six or seven years ago, advised him to go ahead and divide the property with his sister, appellee Sowl; that they (the other Ueltzen heirs) had tried to get it and couldn't; and that they didn't want it. When asked, he first said that there was nothing said by any of his other aunts and uncles with reference to the ownership of t he property until his memory was refreshed by his attorney. Then he told of an occasion at a store at Graphic when one Amos Watkins asked his Uncle Bob (R. T. Ueltzen) what they had ever done about the old home place and Uncle Bob replied that *he* had given it to Roe's mother years ago. In this, Roe was corroborated by Amos Watkins. Although R. T. Ueltzen denied the conversation, he remembers going with Roe to the store.

In spite of appellee Roe's testimony that there were no statements by his aunts and uncles relating to the ownership of the property, when later asked if there was any discussion as to who owned the property during his mother's lifetime, he undertook to tell of a conversation among his mother, his Aunt May and his Aunt Chloe in which each of the aunts said that his mother could have her part of the place. He does not fix the time of these conversations in any way.

Appellee Sowl's testimony is most unsatisfactory.

She said that she and her brother were just little kids when her mother redeemed the property, but she could remember her mother discussing the matter with her brothers and sisters before she redeemed it and that they said as far as they were concerned it was hers. She claimed to have heard her aunts and uncles say at different times that the property was her mother's, but she never identified a time or place or person. In face of the denial of appellants, this is certainly equivocal, unclear, unconvincing and unsatisfactory. No parol gift can be sustained on any such testimony as this. The fact that Maude Roe obtained a redemption deed from the State of Arkansas is much more consistent with the position of appellants that she was to pay the taxes and occupy the property without payment of rent than with the contention of appellees. A redemption deed from the State, of course, is in effect a mere payment of taxes and does not purport to convey any title. *Mabrey v. Millman*, 208 Ark. 289, 186 S. W. 2d 28; *Gott v. Moore*, 218 Ark. 800, 238 S. W. 2d 754.

We should not overlook the fact that this is a case where tenants in common are claiming adversely to other tenants in common. The trial court and the majority of this court recognized that the possession of one such tenant is the possession of all; that much stronger evidence of adverse possession is required where the tenants are related than would otherwise be the case; and that it is incumbent upon one claiming adversely to a tenant in common to unequivocally bring home to the latter knowledge of his adverse claim.

Failure of proof on the parol gift leads only to the conclusion that the original possession of Mrs. Roe was permissive. Having been permissive, it is presumed to have continued to be so and could never be anything else regardless of duration in the absence of an explicit disclaimer. *Terral v. Brooks*, 194 Ark. 311, 108 S. W. 2d 489; *Dial v. Armstrong*, 195 Ark. 621, 113 S. W. 2d 503; *Gibbs v. Pace*, 207 Ark. 199, 179 S. W. 2d 690.

Where one of the parties in a claim of adverse holdings entered permissively, the statutory period will not begin to run until an adverse holding is declared and notice of such change is brought to the knowledge, of an owner. *Bailey* v. *Martin,* 218 Ark. 513, 237 S. W. 2d 16; *Still* v. *Still,* 239 Ark. 865, 394 S. W. 2d 733.

When a tenant in common seeks to oust or dispossess the other tenants and turn his occupancy into an adverse possession and acquire the entire estate by lapse of time under the statute of limitations, he must show when knowledge of such adverse claim, or of his intention to so hold was brought home to them, for it is only from that time that his holding will be adverse. *Singer* v. *Naron,* 99 Ark. 446, 138 S. W. 958; *Gibbs* v. *Pace,* 207 Ark. 199, 179 S. W. 2d 690. Just last May this court held that a cotenant must prove that he asserted a hostile claim and that notice thereof was brought home to his co-owners. *Palmer* v. *Sanders,* 240 Ark. 859, 342 S. W. 2d 300.

Roe admits that he never told his aunts and uncles that he was claiming the property adversely. Mrs. Sowl seems to claim to have told them, but her testimony is so unsatisfactory that it is inconclusive and of no value whatever. This is her testimony on that subject:

"Q. And since you and Billy have gotten the deed did you ever notify these folks that you were claiming to own the property?

A. I think they knew.

Q. I don't know whether they knew or not. I am asking if you personally ever did?

A. Yes.

Q. When and where did that happen?

A. I couldn't pin it down to the exact date.

Q. Where did this conversation take place?

A. I think it was around the time of Mother's funeral.

Q. They were back at that time?

A. Yes, they were all back except Ontie.

Q. Did you notify them at that time you had a deed to the property?

A. There was so much going on we didn't sit down and say we owned this, there is the deed.

Q. Are you saying that you told them at that time that your mother had made a deed to the property to you?

A. We have the deed, yes.

Q. I know you have it. I am asking if you told them that you had it?

A. Yes.

Q. Who did you tell?

A. Different ones of them at different times.

Q. Did you just volunteer the information that you had a deed?

A. It is just a course of conversation when you talk to relatives.

Q. Now, of these people here, which one did you?

A. Different ones.

Q. That hasn't been so long ago. Just which one?

A. Uncle Bob, and I know Uncle Will knew about it.

Q. Did you tell him about it?

A. We talked about it.

Q. You and Uncle Will talked about it?

A. With Billy.

Q. What did they say when you told them you
had a deed?

A. They didn't say anything. They didn't say they
opposed it, or anything.''

Appellees rely on the building of improvements,
the payment of taxes, the retention of rents and profits,
the selling of timber, and the failure of appellants to
claim benefits or make contributions, along with a deed
from their mother, to . overcome the presumptions and
establish their disclaimer.

The conveyance cannot be relied on to establish a
disclaimer. As was said of a mortgage in *Tennison* v.
*Carroll*, 219 Ark. 658, 243 S. W. 2d 944, a cotenant should
not be expected to check a record constantly to deter-
mine whether such instruments have been executed. A
brother's joint occupancy of a farm with his mother,
who was entitled to homestead and unassigned dower,
was held insufficient to support a claim of adverse pos-
session against his brothers, even though the mother
had conveyed her interest to the former by deed of which
the latter had no knowledge. *McGuire* v. *Wallis*, 231 Ark.
506, 330 S. W. 2d 714. Nor were they, in that case,
charged with notice of a deed of their brother to his
son when they had no knowledge of the deed and it was
not followed by any visible change in the possession of
the property.

In the case last above cited, this court reversed a
decree of the Hot Spring Chancery Court sustaining a
claim of adverse possession even though the occupying
brother lived in a house that was on the land, built and
occupied a house thereon, was in charge of the farm,
managing it for his own benefit, paying taxes and pay-
ing installments upon a mortgage debt. In addition, the
construction of two barns, drilling of a well and putting
in a stock pond by this brother's son were not sufficient
to persuade this court that this would satisfy the require-
ment of notorious, unequivocal action necessary.

Living on the property, improving it, paying taxes and collecting rents were held insufficient to overcome the presumption accompanying a permissive entry in *Flunder* v. *Childs,* 238 Ark. 523, 382 S. W. 2d 881, reversing the lower court.

The fact that cotenant's brother paid no taxes, collected no rents or profits, exerted no control and contributed to no improvements while off the land for 18 years was held insufficient to constitute notice that his sister was claiming adversely to him in an action against his sister's grantee. *Baxter* v. *Young,* 229 Ark. 1035, 320 S. W. 2d 640.

Continued review of cases would only extend this opinion. I find it impossible to distinguish this case from *Gibbs* v. *Pace,* 207 Ark. 199, 179 S. W. 2d 690, applying almost every principle involved here. There a parol gift from the cotenant was claimed. The claimant also asserted adverse possession evidenced by physical possession, enjoying profits, cutting timber, paying taxes, and making improvements. There the cotenant, claiming adverse possession, wrote one of the heirs of his cotenant seeking to purchase whatever interest the heirs might have. The similarity even goes to the extent that interest was activated in that case by an attempted sale of fee simple title to a stranger to the tenancy and here by an oil lease. It cannot be said that the difference lies in the decree of the chancellor having been favorable to the absent cotenants in the *Gibbs* case and unfavorable in the present case. It is clearly stated in the opinion in the former case that the cause was tried *do novo* and nowhere is there any mention of any weight being given the lower court's decree.

I am willing to concede that there is a basis for sustaining the trial court's findings as to W. R. (Will) Ueltzen and R. T. (Bob) Ueltzen by estoppel.

Proof of a transaction constituting an estoppel must also be clear and convincing. There must be cer-

tainty to every intent and the party setting it up must prove it strictly. *Arkansas National Bank* v. *Boles,* 97 Ark. 43, 133 S. W. 195; *James Talcott, Inc.,* v. *Associates Discount Corp.,* 302 F. 2d 443 (1962).

I think that proof is satisfactorily clear to sustain the lower court's holding that they are estopped from any claim in this land by failure to speak when they should have spoken. Billy Roe's testimony about his Uncle Will's advice concerning division of the property was positive and unequivocal. Roe said he once suggested a place for a division line. He further stated that Will Ueltzen did not claim any interest when Roe advised him of the oil lease. Will Ueltzen's denials are at least tempered by tacit admissions on cross-examination. He could have at least advised the attorney for Roe about his claim when the lease came up, but excused himself by saying, "I didn't know you wanted to know." Roe also testified that W. R. Ueltzen said that he would sign a quitclaim deed when the matter of the oil lease first came up.

The evidence as to estoppel of R. T. Ueltzen is even more convincing, in view of Amos Watkins' testimony about the conversation at the store at Graphic.

It must be remembered that the other heirs of R. R. and Laura Ueltzen were living out of the state and quite a distance from the property. They are not bound by any statements of their tenants in common. 31A C. J. S., 814, Evidence, § 318. Nor do I see any inconsistency in their being agreeable to having the property occupied and used by the children of their sister, Maude, but not being willing for them to sell, lease, or convey the property or interests therein to outsiders. Undivided absentee ownership of property presents many practical difficulties in management which does make the position of these heirs reasonable and tenable.

I would affirm the chancery court's decree as to W. R. and R. T. Ueltzen but reverse it as to the other

heirs of R. R. and Laura Ueltzen. I fear the result reached by the majority is an erosion of rules of property by improper application.

I am authorized to state that Byrd, J., joins in this dissent.