JUANITA COOPER ET AL *v* TROY COOPER ET AL

5-5733 476 S.W. 2d 223

Opinion delivered February 21, 1972

*Murphy, Arnold & Blair,* for appellants.

*W. E. Billingsley;* By: *L. Gray Dellinger,* for appellees.

CARLETON HARRIS, Chief Justice. This litigation relates to the ownership of a 20 acre tract of land located

in Izard County, Arkansas. Appellees are Tursey Cooper, widow of Robert J. Cooper, and all of the heirs at law of Robert J. Cooper except the appellants. Appellants are Juanita Cooper, widow of Leslie Cooper, and the heirs at law of Leslie Cooper. Leslie was a son of Robert Cooper, the latter dying intestate in 1951. Leslie Cooper died intestate in 1968. In their pleadings, appellees alleged that Leslie and Juanita Cooper, who had earlier purchased the 20 acres in question, conveyed said tract to Robert Cooper, but that the deed had never been recorded, and had been lost. It was asserted that Robert Cooper went into possession of the premises at the time of the conveyance, and maintained possession until his death in 1951; that since that time, Tursey Cooper had claimed dower and homestead in the lands, and had paid taxes on same. In their answer, appellants stated that the land was purchased by Leslie Cooper in 1929 and it was denied that Leslie and wife had conveyed the lands to Robert Cooper. Appellants likewise denied that Robert Cooper had acquired any title by adverse possession; to the contrary, it was asserted that Robert Cooper had permissive possession of the property while Leslie and Juanita were in California. At the conclusion of the evidence, both sides moved that the pleadings be considered amended to conform to the proof, including the plea of adverse possession on the part of appellants and appellees. This motion was granted. Thereafter, the trial court entered its decree finding that the greater weight of the evidence supported the contention of appellees, and that Robert Cooper was the owner of the twenty acre tract at the time of his death in 1951, the proof reflecting that during his lifetime, title had been perfected to the lands by adverse possession; that the children of Robert Cooper and their descendants became tenants in common of the lands owned by him at the time of his death, subject to the dower and homestead rights of Tursey Cooper. It was found that the contentions and claims of appellants were without merit, and should be denied. From the decree so entered, appellants bring this appeal. For reversal, appellants rely upon four points which we proceed to discuss in the order listed.

It is first asserted that appellees did not establish by competent evidence that Robert Cooper secured from

Leslie Cooper, the son, a deed which was subsequently lost. We agree that no lost deed was established, but since the trial court's decree was based upon a finding that Robert Cooper had acquired title by adverse possession, there is no need to discuss the question of the lost deed.

It is next asserted that the finding that Robert Cooper had obtained title by adverse possession to the 20 acre tract was against the preponderance of the evidence. Under this point, appellants first urge that the original use of the property by the father was permissive, and accordingly, it was necessary that notice of an adverse claim be given by unequivocal acts of hostility. In *Bellamy v. Shryock*, 211 Ark. 116, 199 S. W. 2d 580, this court pointed out that as between parties holding parental and filial relations, the possession of the land of the one by the other is presumptively permissive or amicable, and, for such a possession to become adverse, there must be some open assertion of hostile title (other than mere possession) and knowledge thereof brought home to the owner. We agree that appellants thus correctly state the law, and the question before us is whether the proof offered by appellees met this requirement. According to Juanita Cooper, in purchasing the land (together with other lands not here involved), Leslie and Juanita found it necessary to borrow $500.00 in order to complete the purchase. Juanita stated that Robert Cooper loaned $300.00 of this amount and her father loaned the other $200.00. She testified that Robert Cooper said that if Leslie and Juanita would let him use the field (located in the 20 acres in dispute) they could "hand the $300.00 back" (at no particular date) and this would be satisfactory, an arrangement to which they agreed.

"Well, Mr. [Robert] Cooper used the field. It didn't include 20 acres; it was a field inside of this tract of land—just the field—and he planted it in first one thing and another in whatever he chose."

This was, according to Juanita, the status of the matter until 1938 when Leslie and Juanita went to California. It appears from Juanita's testimony that they were in and out of California for over 15 years.

"Well, the first time, we just stayed a few months, and then we came back, and we stayed at home for awhile. And then we went back and stayed awhile; then we came back again and stayed awhile; and then we went back later and stayed 15 years."

She said that in 1940, Leslie's nephew, Lowell Cooper, was serving as postmaster in the community and built a country store and postoffice, with living quarters, on the 20 acres. While this building was under construction, Lowell and wife lived with Leslie Cooper and his wife who had a home on lands not here involved. She stated that Robert Cooper told her not to execute any deed to Lowell for any part of the 20 acres because "he won't stay here any time and, if he has got a deed to it, he would sell it to somebody, and we might have a beer joint right here under our nose, and we don't want that". Leslie and Juanita subsequently returned to California and resided there approximately 15 years, though the evidence reflects that Leslie returned several times through the years. During that time, Robert Cooper exercised various acts of ownership. Robert Cooper, commencing with the 1940 taxes, paid from that time until his death in 1951, and the taxes thereafter were paid in Robert Cooper's name until 1969, when the original petition to quiet title was filed. Juanita Cooper testified that she paid the taxes for 1968 in 1969, but that she understood the taxes for that year had been paid twice. When she endeavored to pay the 1969 taxes, she learned that they had already been paid.[1] Juanita testified that she authorized her son, Lonnie, to make the $300.00 payment due Robert Cooper, to Troy Cooper, Robert's son, and one of the appellees herein, who, in 1957, was managing the properties of his father, but Troy would not take the money, and it has never been paid. Lonnie also testified that upon returning to Arkansas in approximately 1957, (after getting out of the service), he, at the request of his parents, went to the home of Troy Cooper and offered him the $300.00 that had not been paid to Robert Cooper, but he stated that Troy refused to accept it. As to this fact, Troy Cooper testified that Lonnie did come to see him, but not for

---

[1] It is not clear which of the appellees paid these taxes, but they were paid in the name of Robert Cooper.

the purpose of paying back any $300.00 due Robert Cooper. He said that, to the contrary, Lonnie stated that he had a letter from his father and wanted to buy the 20 acres.[2]

A number of witnesses testified on each side, twelve for appellees, of which five were not related; seven witnesses testified for appellants, four of which were not related. The testimony of several of the witnesses offered by appellees was to the effect that Robert Cooper had complete charge of the 20 acres during his lifetime and was recognized as the owner. For intstance, Frank Page of Melbourne, apparently disinterested, testified that he lived on the place for about three years; he rented the building located on the 20 acres from Robert Cooper and paid rent to the latter; he also farmed the land for two years. Page said that for at least two years of the time he (Page) was renting the premises, Leslie lived just across the creek from the store, and that Leslie never indicated to him in any way that he (Leslie) was the owner of the lands, and further, that Leslie never tried to collect any rents from him. Evidence was also offered by both sides to the effect that while Leslie was in California, those renting Leslie's lands also paid the rent to Robert, but there is no contention but that Robert remitted these rents to Leslie, and never made any claim to any of the son's property other than the 20 acres. L. D. Lafferty, a disinterested witness, who did some "bush hogging" on the 20 acre tract in 1968, testified that Juanita Cooper told him that Mrs. Robert

---

[2]From the testimony of Troy: "He come to my house and said he got a letter from Leslie wanting to come back and he wanted to buy that piece of land. I said, 'Lonnie, the way that is set up, we made an agreement with Garland to move down there and take care of my mother for the use of this land.' And I said, 'I couldn't afford to try to tear that up for she has got a home and as long as she is satisified and as long as Garland is satisfied, I am willing to let it go.' But I said, 'If, and it is not time to settle the estate, that would give somebody else a chance to buy the other.' And I says, "You go on back home and when the time comes, I think Leslie should have a chance at this and I will be for him buying the land; if it is all right with the rest of them, I am for it, but it is not time to settle this now.' I said, 'Lonnie, it don't make any difference, that is just the way it is. We made that agreement and, if we was to go in there and sell part of his land off, Garland wouldn't be satisfied and it wouldn't be right and he wouldn't stay there with mother and, as long as they are satisfied, let them alone.' "

Cooper (Tursey) was the proper party to see about his plan to build a little park on the 20 acres.

Evidence was offered by appellees to the effect that taxes on a 20 acre tract which had previously been paid in the name of Leslie Cooper, were, commencing in 1941, paid in the name of Robert Cooper, but they were paid under a part description, and this continued from 1941 until 1967. Appellants contend that taxes so paid are not evidence of ownership of the lands, the description being void. We agree with that contention, but we do think that the evidence was admissible as a matter of calling Leslie's attention to the fact that his father was evidently making claim to this 20 acre tract. Let it be remembered that Leslie had other lands upon which Robert was paying taxes (while the son was in California) but these taxes were consistently paid in the name of the son. It has already been mentioned that Leslie was back in the community from time to time. The record does not disclose whether he went to the courthouse, but since it appears from the testimony that he was in Arkansas for as much as a couple of years, at least on one occasion, it is logical that he would have been paying taxes on his own property and would have noticed the fact that a 20 acre tract, formerly in his name, had been changed.

Several witnesses also testified that the general reputation in the community was that Robert Cooper owned this 20 acres, and appellants contend that this evidence was inadmissible. We agree that the testimony was not admissible as a matter of establishing title to the property, but we think it was admissible to show that Robert Cooper's acts of ownership were so notorious as to leave the distinct impression that his possession was adverse.

As far as definite recognition by Leslie and Juanita Cooper of the claim of Robert Cooper to this 20 acres is concerned, one circumstance adds cogently to the contention of appellees. In December, 1929, Leslie and Juanita Cooper mortgaged their property to the Bank of Melbourne and the mortgage included the 20 acres here under discussion. In 1934, a mortgage was given to the

Federal Land Bank by Leslie and Juanita, and this mortgage also included the 20 acres. However, in February, 1959, a deed of trust from Leslie and Juanita was given to the Bank of Melbourne and the *20 acres in question were not included in the deed of trust.* Juanita Cooper was unable to explain why this tract was not included, "I don't know the reason why". It is also curious that over 15 years passed before Leslie and Juanita tendered the $300.00, which they said was due Robert Cooper; in fact, the latter had been dead for several years. Since the early part of the 15 year period covers a time of general prosperity, it would appear that this sum of money could have been earlier paid. We are of the view that appellees offered sufficient testimony to establish that the possession of Robert Cooper was open, hostile, and adverse to the title of Leslie and Juanita Cooper and was sufficient to bring that fact home to Leslie and Juanita.

Appellants assert, that even though this court finds that adverse possession was established by Robert Cooper, appellants in turn re-acquired title to the land in question by adverse possession. This claim is based on a contention that they used this 20 acres as pasture for their cattle. They assert that this use commenced in 1957, and that a fence on the east separated the tract from lands of Lonnie Cooper; on the north there was a fence along the south right of way of Knob Creek Road, with Lonnie Cooper's lands being north of the road; on the south there was Knob Creek, separating other lands of Juanita Cooper from the 20 acre tract, there being no usable fence between Juanita's lands and the 20 acres, and on the west were the lands of Lonnie Cooper and R. J. Blankenship. Appellants state:

"Thus, the Creek forms an effective boundary of lands claimed by Appellants along with fence and road on the north and fence on the east."

Various witnesses testified that they had seen cattle on the tract after 1957, and appellants say that since no appellee claims to have had cattle on this 20 acres since that time, it has been established that the land was used

solely by them, but there is also testimony that the fences were "sorry" and not sufficient to keep cattle from roaming to the 20 acres from other properties. The grazing of the cattle on the 20 acres was by far the main fact testified about, and the principal one relied upon by appellants. Two persons testified that they obtained permission from Leslie to remove gravel from the 20 acres, one witness stating that this occurred in 1956 and 1969, the other stating that it occurred in 1964. Juanita also testified that she had mended fences around the acreage in dispute. This pretty well was the sum total of appellant's evidence. However, the transcript reflects that appellees were also exercising acts of ownership during this period.

We do not think it was established that appellants used this land for more than seven consecutive years, or that their use was exclusive, or adverse to the interests of appellees and, in fact, the grazing of livestock over land, while it should be considered with other acts of dominion, is not of itself sufficient to establish adverse use. See *Nall* v. *Phillips,* 213 Ark. 92, 210 S. W. 2d 806; nor do we consider the other acts of asserted ownership to be sufficient to establish this claim. However, were it otherwise, appellants still could not prevail, for we have held on numerous occasions that the possession of one tenant in common is the possession of all tenants. *Ueltzen, et al* v. *Roe,* 242 Ark. 17, 411 S. W. 2d 894, and cases cited therein; it is also well established that in order for the possession of a tenant in common to be adverse, it is necessary for him to bring home to his cotenant knowledge of his hostile claim by acts so notorious and unequivocal that notice must be presumed; *Ueltzen, et al* v. *Roe, supra,* and cases cited therein. Certainly, the quantum of proof was not sufficient to establish this fact. On the whole case, it would appear that appellees presented a much stronger and persuasive case in support of their contentions than did appellants. It must also be remembered that where witnesses outrightly contradict each other and testify to a totally different set of facts, the chancellor, who sees and hears the testimony, is in a much better position to determine which witnesses are telling the truth.

Finally, appellants state that in event the court should hold with appellees, the 20 acre tract should be partitioned since it is not adjacent to nor contiguous with the other acreage which was owned by Robert Cooper, was never used as a home by either Robert or Tursey, and is not a part of the widow's homestead. We agree that the testimony reflects that the 142 acres which was owned by Robert Cooper, and the 20 acres are two separate and distinct farms, and it would certainly appear that the property is not susceptible of division into the minute interests of the numerous heirs. Accordingly, we agree that the 20 acres should be sold under order of the court with the widow's dower interest determined by the court and awarded from the proceeds.[3] In all other respects, the decree is affirmed.

It is so ordered.

FOGLEMAN, J., dissents.

JOHN A. FOGLEMAN, Justice, dissenting. It seems to me that both the chancellor and the majority have overlooked the quantum of proof essential to the establishment of title in a father by adverse possession against a son who is the holder of the record title. Because I think that appellees failed to meet their burden of proof, I dissent. This burden requires more than a mere preponderance, but it is clear that the chancellor found no more. The treatment of the matter in the majority opinion also seems to rest upon that premise. Our review might be so limited, had the chancellor found that the burden actually imposed upon appellees had been met.

In such a case the parent must sustain his proof of adverse possession by stronger evidence than is required in ordinary cases. *Bellamy* v. *Shryock*, 211 Ark. 116, 199 S. W. 2d 580; *Staggs* v. *Story*, 220 Ark. 823, 250 S. W. 2d 125. It was described as a heavy burden in *McGuire* v. *Wallis*, 231 Ark. 506, 330 S. W. 2d 714. There we reversed the decree of the trial court because we found that this burden had not been met. I find it impossible to

---

[3]There are some 20 different interests shown in the property ranging from a 1/40th interest to a 1/5th.

draw any real distinction between this case and that. There, the adverse claimant sought to establish that his father's possession had been adverse to other heirs of the claimant's grandfather. It was pointed out that the father was in charge of the farm, managing it for his own benefit, paying taxes, and paying the installment upon the mortgage debt. Such conduct was held insufficient to show adverse possession against a cotenant. I submit that it was likewise insufficient to show adverse possession against a son.

The majority correctly states that the possession as between those in parental and filial relationship is presumptively permissive and that before it becomes adverse, there must be open assertion of a hostile title, other than possession, which is brought home to the owner. The knowledge of intention to hold adversely, as between close relatives, seems to be "full knowledge." *Armstrong* v. *Armstrong*, 181 Ark. 597, 27 S. W. 88. Until the adverse holding is declared and there is notice to the owner of the change in the character of the possession, it does not become adverse and the statute does not begin to run. *Bailey* v. *Martin*, 218 Ark. 513, 237 S. W. 2d 16. A hostile attitude must have first been brought to Leslie Cooper's attention. *Mayfield* v. *Smith*, 201 Ark. 603, 146 S. W. 2d 715. I have tried in vain to ascertain from the record and from the majority opinion just when it can be said that a presumptively permissive possession became adverse.

It must be remembered that in this case, the father not only collected rents on the particular 20 acres, he also collected rents on other lands, admittedly owned by the son, according to Frank Page, a tenant over a period from 1947 to 1951. The original possession was alleged to have originated on the day of the purchase by Leslie in December 1929 and continued until R. J. Cooper's death in 1951. There seems to have been absolutely nothing different about its character during all these years.

At the time of the purchase Leslie Cooper and his wife undertook the payment of a debt to the Federal Land Bank upon which there was a balance of $762.84, secured by an existing mortgage which included this

land, and gave a mortgage to the Bank of Melbourne on December 24, 1969. On February 1, 1934, they gave a mortgage including the land to the Land Bank Commissioner. Juanita Cooper's testimony that R. J. Cooper endorsed the note at the Bank of Melbourne is not contradicted, and she testified that she and her husband paid this note in 1934 and she exhibited a release deed for that mortgage. Nor is there any attempt to contradict her testimony that she and her husband paid the debts secured by the Federal Land Bank and Land Bank Commissioner mortgages. There was really no attempt to contradict her testimony that at all times she and Leslie Cooper were in California, R. J. Cooper collected the rents from their tenants and paid their taxes. While I realize that the testimony of an interested party cannot be taken as uncontradicted, still I find no excuse for appellees not having sought to show otherwise or to offer some reason for being unable to do so, if these were not the facts. It also seems strange that no one ever asked Leslie to give a deed to this 20 acres either to his father or to his mother after the father's death.

The majority places far too much emphasis on the change in land description on the tax books. Prior to the 1941 tax book, it is clear that the 20 acres were included in a valid description by government survey calls with other lands owned by Leslie. At a time when he was in California, someone penciled through the calls and listed in Pencil "Part NE SE, 20" acres, carried in the name of R. J. Cooper, and this entry was continued up until 1969. Just how and when this can be said to have come to Leslie's attention, I do not know, and I submit that the majority is engaging in the rankest kind of speculation to say that it did. Appellees' witness, Frank Page, put the interval when Leslie Cooper was in Arkansas for some extended period of time as being between 1947 and 1951, during which time Page paid rents on this 20 acres and other lands owned by Leslie to R. J. Cooper, not Leslie. It is reasonable to assume that if R. J. Cooper was collecting the rents, he was also paying the taxes.

Furthermore, Leslie Cooper certainly cannot be charged with notice, much less knowledge, of a patently void and indefinite description on the tax books. One of

the purposes of requiring a proper description on the tax books is to inform the taxpayer what property is taxed and a description such as the one used here does not properly identify any land because the owner cannot know from this description what lands were assessed as his, nor whether the land of others might be included in the assessment. *American Portland Cement Co. v. Certain Lands,* 179 Ark. 553, 17 S. W. 2d 281. In this connection, there is no evidence that the tax book description on Leslie's land was changed. An acreage change is the only change indicated on the description of Leslie's land, which was according to government survey calls. This being the case, the number of acres set opposite the description is of no significance. *Plant v. Sanders,* 209 Ark. 108, 189 S. W. 2d 720. There is not even any evidence that the reduced acreage figure appeared opposite the description of Leslie's land in tax books for year subsequent to 1941.

Because I think that appellees failed to meet their burden of proof, and because I think that the chancellor clearly did not require them to meet the burden imposed, I would reverse the decree.