### George B. THWEATT et al v. J. E.
### HALMES and Pauline HALMES

78-172                                    580 S.W. 2d 685

#### Opinion delivered April 30, 1979
#### (In Banc)
[Rehearing denied June 4, 1979.]

*Friday, Eldredge & Clark,* by: *William L. Terry,* for appellants.

*A. Jack King,* for appellees.

CONLEY BYRD, Justice. The trial court found that appellees J. R. and Pauline Halmes and those through whom they claimed title had acquired by adverse possession an undivided one-half interest in and to all the coal in and under the "back forty" or "south forty" originally conveyed to Charles Thweatt on June 3, 1927. For reversal appellants, who claim title as heirs or devisees of Charles Thweatt and Frank H. Dodge, contend the chancellor erred in holding that the actions of Joe Halmes, grandfather of appellee J. E. Halmes, were sufficient under the law to establish all required elements of adverse possession, especially when viewed in light of the rules pertaining to tenants in common.

The parties stipulated that the area involved — *i.e.* SW NE 22, T 10 N, R 26 W — consisted of forty acres and was also known as the "back forty" or "south forty" of the Joe Halmes farm.

Alic Nichols testified that he was familiar with the Joe Halmes' south forty. Coal mining commenced in 1920 or thereabouts and lasted until about 1950. The mined coal went mostly to Mulberry and Missouri. It was common

knowledge in the community that Joe Halmes delivered coal for use of the people in the community and elsewhere.

J. E. Halmes testified that there was a continuous mining operation carried on from the early 30's until the 50's. The last mining was done in 1952 or 1953. His grandfather, Joe Halmes, was the only person who benefited or profited from an ownership in the coal under the land during that period. The mining operation would produce so much coal and then wait until the coal market started moving before the mining operation would start up again. It was common knowledge that his grandfather was mining and had coal for sale. His grandfather advertised "coal for sale" in the paper and maintained a big sign on the place with an arrow that said "Coal for Sale." His father and Robert McElroy leased the land in 1936 or 1937 and mined continuously until Mr. McElroy died in 1940 or 1941. After that operation stopped people would come in and lease a small area, on which two or three men would work. After he got out of military service in 1946, he, his brother, and their father bought an electric coal digging machine and mined for two years. After they closed down, some other people leased the mine and worked it by hand until the early 50's. This mining operation all took place on the "back forty" or "south forty" of the Joe Halmes place. He estimated there were 15 shafts sunk on this particular 40. He states that the coal mining was as continuous as it could be because of the market. If the market was there, the mining was carried on every day or every month. Most of the miners were farmers. They would grow what they could and spend all of their other time digging this coal. If there was a market for coal, the miners would let their crops go, but most of the time there was not that much market for coal in the hot summertime and it was fall before people really started hauling coal. Generally, one would find more mining activity after the miners were able to lay by their crops.

J. E. Hardcastle testified that he helped sink some of the shafts on the "back forty." This occurred from 1928 to about 1939 or 1940. He estimated there were five or six shafts located upon this particular forty besides the slopes. "The slopes would just go back in the ground about 20 feet till you get to the coal. A lot of us fellows farmed and when we got our crops laid by we would go back to mining, but there were a

lot of guys out there that didn't do anything but mining. There was a sign out there pointing to the coal. We built a road out there in the 30's to haul that coal out on. This one forty was the only place we worked. The rest of the area was too deep to mine."

Theo Dunford testified that he knew Joe Halmes carried on a mining operation out there for 20 or 25 years. "It was fairly common knowledge that Mr. Halmes was in the coal business. The coal was distributed to Ozark, Mulberry, Missouri and all around." On cross-examination he testified that he recalled it as the other witnesses had — *i.e.* they would work when there was a market for coal. "Hardly ever did they work the whole year around. There was some out there that worked the whole year around. Most of them just worked after their crops were laid by. It was not possible that a whole year would go by without any mining activity at all."

Appellant George Thweatt testified that he found the deed to his father in his father's papers after his father's death in 1962. The mineral deed to the coal had never been separately assessed and he had never paid any taxes on the land. There were letters among his father's papers showing that there were a few individual miners operating on the property in 1938.

For reversal appellants rely upon *Claybrooke v. Barnes,* 180 Ark. 678, 22 S.W. 2d 390 (1929). There, in reversing a trial court's finding of adverse possession covering a 160 acre tract, we stated:

". . . Evidence for appellee tended to show that some mining had been done on the land for each year since 1911, but nearly all of the mining had been done on a single 40-acre tract of land. All of the mining was surface mining, and no mines were opened up and mining machinery installed on the land. There was no occupancy of any of the land continuously for a period of seven years. The most that was shown was that, every three or four months, some of the appellees would work surface mines on the land. They all did so under leases from W. E. Barnes in his lifetime and from Mrs. Laura Barnes after his death. It is not possible, however, to take out

any definite part of the land which was so mined, and the evidence does not show any continuous operation of mines for the period of seven years. At best it was only a fitful and desultory occupancy for mining purposes, and was not continued for the necessary length of time to give title by adverse possession for the statutory period of seven years."

On the contrary, the record here shows that there was a continuous occupancy of the "south forty" or "back forty" for mining purposes. Some 15 shafts were sunk in addition to the mining of the slopes. A sign was maintained with an arrow showing "Coal for Sale." Advertisements of "Coal for Sale" were run in 'newspapers. A road was constructed to haul the coal to market. The parties stipulated that the only area on which appellees claimed adverse possession was the area known as the "back forty" or "south forty" of the Joe Halmes' farm. All of the witnesses described the area worked as the "back forty" or "south forty." Furthermore, the letters in the files show that Charles Thweatt had knowledge of such coal mining operation as early as 1938. Consequently, we cannot say that the trial court's finding of adverse possession is contrary to a preponderance of the evidence.

Affirmed.

Harris, C.J., and Fogleman and Hickman, JJ., dissent.

Darrell Hickman, Justice. With all due respect, the majority has, in my judgment, failed to apply the law to this case.

The appellants are owners of one-half of the mineral interests in this land by virtue of a deed that dates back to 1927. The original owners of the interest, kinsmen of these parties, are now deceased.

This property interest was held by the parties and their predecessors as tenants in common. The coal has not been mined for 25 years. Before that, there was a small mining operation. There is not one item of evidence in this record of any single act that could be used to argue that the appellants

or their predecessors in title had notice of adverse possession as required by law.

In the case of *McGuire* v. *Wallis,* 231 Ark. 506, 330 S.W. 2d 714 (1960), we dealt with a similar case where possession, as well as other facts, was used as a justification to claim title adversely. In *McGuire,* the cotenant was in charge of a farm, managing it for his own benefit, paying taxes and paying the installment payments upon a mortgage debt. We found these facts insufficient to support a claim of adverse possession against a cotenant. We said:

> . . . *in order for that possession to be adverse it was incumbent upon Clovis to bring home to his cŏtenants knowledge of his hostile claim, either directly or by acts so notorious and unequivocal that notice must be presumed. Smith* v. *Kapler, supra.* Upon this point Clovis's proof is fatally deficient. It is fair to say that his own testimony, when carefully read in its entirety, discloses that he never asserted a claim of exclusive ownership to a single one of his interested uncles, aunts, or cousins. His testimony implies that these relatives should have deduced from his occupancy that his position was hostile, but the law is otherwise.

> Nor do we find in the record proof of any acts so notoriously and unequivocally hostile as to charge the appellants with knowledge of Clovis's adverse claim. Counsel list an imposing array of facts that are said to satisfy the appellee's burden of proof, but for the most part the various acts relied upon are merely subordinate aspects of conduct which, taken altogether, amounts simply to possession of the property. . . . [Emphasis added.]

The appellees argue that they had exclusive possession of the property and did not share the benefits from the coal. But, aside from these facts and the passage of time, they have nothing more. There was no severance of the mineral interests so that the taxes could be paid separately. The first notice of an adverse claim was when this lawsuit was filed by the appellees.

We have traditionally required a higher degree of proof

when one cotenant seeks title by adverse possession against another cotenant. In the case of *Bowlin* v. *Keifer,* 246 Ark. 693, 440 S.W. 2d 232 (1969), we emphasized the principles of law that apply to such a case.

> . . . In order for possession of a tenant in common to be adverse to that of his cotenants, knowledge of the adverse claim must be brought home to them directly or by such notorious acts of unequivocal character that notice may be presumed. *Griffin* v. *Solomon,* 235 Ark. 909, 362 S.W. 2d 707. Stronger evidence is required when a family relationship exists than in other cases. *McGuire* v. *Wallis,* 231 Ark. 506, 330 S.W. 2d 714; *Ueltzen* v. *Roe,* 242 Ark. 17, 411 S.W. 2d 894. The burden of proof was upon appellee. *Smith* v. *Kappler,* 220 Ark. 10, 245 S.W. 2d 809. . . .

The appellees have failed to demonstrate any hostile act or acts that could place the appellants or their predecessors in title on notice that their claim, evidenced by deed of record, was being taken from them without compensation by virtue of the right called adverse possession.

It was never intended that the law of adverse possession be used to give someone something that is unjustified. The law of adverse possession is intended to be a tool to solve title disputes, cure legal defects and settle boundary line disputes. It has been used by the appellees in this case to take something that does not belong to them rightfully or legally. With all due respect to the majority, I submit that the law was misinterpreted by the trial judge, not applied by the majority, and I would reverse and dismiss the decree of the chancellor.

I am authorized to state that HARRIS, C.J., and FOGLEMAN, J., join in this dissent.