Ruby BARR, et al. *v.* Albert W. EASON

86-193                                728 S.W.2d 183

Supreme Court of Arkansas
Opinion delivered May 4, 1987
[Rehearing denied June 8, 1987.]

*Williams & Kemp*, for appellant.

*James H. Pilkinton, Jr.*, for appellee.

JOHN I. PURTLE, Justice. This is an appeal from a decree holding that the appellee was the owner of the surface rights of land in the S ½ of the SE ¼ of Section 6, Township 20 South, Range 27 West, Miller County, Arkansas, containing 80 acres more or less. The decree also held that the appellee was the owner of his intestate share of the mineral rights in the NW ¼ of the NE ¼ and the NE ¼ of the NW ¼ of Section 7, Township 20 South, Range 27 West, Miller County, Arkansas, containing 80 acres more or less.

On appeal the appellants argue that the court erred in vesting title to the surface rights of the Section 6 lands and the mineral rights in the Section 7 lands in the appellee. We agree with the appellants' first point. However, we disagree with the appellants' argument as to the ownership of the mineral interests in the Section 7 lands.

Parts of Sections 6 and 7 were once owned by S.S. Eason who died intestate prior to 1959. Since his death his heirs have been unable to agree as to the ownership of the surface and mineral rights of the land. The decedent was the father of 15 children. His first wife, Louella, bore him nine children (the "first family"), and he had six children by his second wife, Clementine (the "second family"). Prior to his death S.S. Eason deeded the lands in Section 7 to Clementine. A dispute between the first and second Eason families culminated in chancery court actions during 1944 and 1945. Decrees were entered granting all 15 children an equal interest in the mineral rights to the lands in both Sections 6 and 7. No appeal was taken from the final decree.

One area of contention between the two families concerns

the ownership of the surface rights of the lands in Section 6. From the record we find that these lands were forfeited for the 1959 taxes and were sold to H.M. McIver on November 20, 1962. McIver was a stranger to title prior to the tax purchase. The property was conveyed by quit claim deed from McIver and his wife to John Edward Eason on January 18, 1963. The grantee was the son of S.S. Eason and the father of Albert W. Eason, the appellee herein. The appellee's father deeded the property to the appellee on January 19, 1963. There was no monetary consideration for this transfer. However, the appellee testified that he gave his father the money to redeem the property from McIver.

We first consider the chancellor's ruling concerning the mineral rights to the Section 7 property. This point merits little discussion. The final decree adjudicating the mineral rights was filed on December 12, 1945. The decree determined that all 15 children of S.S. Eason owned an equal interest in the mineral rights of the lands in Sections 6 and 7. There is no evidence that any of the heirs have acquired title to the mineral interests except through inheritance from S.S. Eason. The appellee's father was one of the 15 children of S.S. Eason. We do not disturb the trial court's determination that the appellee owns his pro rata share of the mineral interests to the lands in Sections 6 and 7, since this finding was not against the preponderance of the evidence.

We next consider the ownership of the surface rights of Section 6. There is no dispute that the appellee's father was a cotenant with the other children of S.S. Eason. Neither is it disputed that McIver was a stranger to the title when he purchased the land at the tax sale. Less than two months after purchase at the tax sale, McIver deeded the land to the appellee's father. The testimony reveals that appellee's father deeded the property to the appellee on January 19, 1963, one day after John Edward Eason received the deed from the McIvers.

The appellee claimed the surface rights to the Section 6 property by both deed and adverse possession. We first discuss the claim under the tax deed. The general rule is that a person who is in possession and receiving benefits from the property cannot acquire title by permitting the property to sell for taxes and then buying it at a tax sale. *Zimmerman v. Franklin County Bank*, 194 Ark. 554, 105 S.W.2d 1074 (1937).

In this case of *Smith* v. *Smith*, 210 Ark. 251, 195 S.W.2d 45 (1946), we considered a similar situation. In the *Smith* case this Court considered the rights of the decedent, his son and grandson. The decedent, D.L. Smith, died in 1931. Several children survived. The eighty acres of land owned by D.L. Smith at the time of his death was forfeited for the 1932 taxes. The land was subsequently redeemed by Laura B. Smith, the wife of Benton Smith, a son of the decedent. In 1945 litigation concerning the title to the property arose among the children and grandchildren of the decedent. In *Smith* this Court, discussing the rights of the children of decedent Smith and the redemption of the land at the tax sale, stated:

> We think however, that in the case at bar Benton, Laura, and G.L. Smith, were too intimately identified with the D.L. Smith estate to make personal purchases in the manner shown. Redemption by one tenant in common or one of several cotenants inures to the benefit of all, in the absence of special circumstances or waiver. Effect of *Spikes* v. *Beloate*, 206 Ark. 344, 175 S.W.2d 579, is that a tenant in common cannot strengthen his interest by bidding in the entire property at a tax sale, or by purchasing it from a stranger who has bought at such sale. These acts amount to no more than redemption. This confers no right upon the purchaser except to justify a demand that contribution be made by other tenants.

We next consider the appellant's claim of adverse possession. This Court expounded on the rights of heirs and cotenants in a similar situation in the case of *Zackery* v. *Warmack*, 213 Ark. 808, 212 S.W.2d 706 (1948). The mother of Zackery died intestate in 1919. At the time of her death she owned the 40 acres of land. Her heirs were her son, John Zackery, the appellant, and his four siblings. The taxes for 1929 and 1930 became delinquent, and Zackery purchased the land at a tax sale. He paid taxes thereafter until 1945, the last year taxes were paid prior to the commencement of the suit.

Warmack filed suit claiming ownership in the same land that Zackery claimed. Zackery filed an answer and cross-complaint wherein he claimed full title to the property based upon the tax deed and adverse possession. The trial court found the tax

sale void but concluded that the deed operated as color of title. This Court held that the redemption for the tax forfeiture inured to the benefit of all relatives and tenants in common. We affirmed the trial court's holding permitting Zackery to retain proceeds of timber sales as reimbursement for taxes paid on the lands. The taxes in the *Zackery* case were paid in the name of the decedent from 1919 until 1929. After the purchase at the tax sale Zackery paid the taxes in his own name. The *Zackery* opinion went on to state:

> The reason that the possession of one tenant in common is prima facie the possession of all, and that the sole enjoyment of the rents and profits by him does not necessarily amount to a disseizin, is because his acts are susceptible of explanation consistently with the true title. In order, therefore, for the possession of one tenant in common to be adverse to that of his cotenants, knowledge of his adverse claim must be brought home to them directly or by such notorious acts of an unequivocal character that notice may be presumed.

The appellee in the present case was never in actual physical possession of the land. There has never been any kind of fence, house or other structure on the section 6 land here in dispute. Appellee sold the timber in July of 1978 and later planted most of it in fingerling pine. The property was neither fenced or marked to indicate the boundaries. Appellee was in the armed forces when the deed between McIver and his father was executed. He has lived out of state during the entire time in question. In a letter to Ruby Barr, dated August 27, 1983, appellee stated his father deeded the land to him "that the land might be more easily handled." He further stated: "as the years went along and as I continued to pay taxes, and with all apparent opportunities to settle the dispute which has been going on now for around 50 years. . .." The letter never expressed the opinion that he was the sole owner of the property. (A new oil well had just been finished on or near some of the land formerly owned by S.S. Eason, appellee's grandfather.)

The appellee testified that he did not know if the other heirs knew that he claimed the property in his own name. He relies on the deed from his father as color of title. Even if the deed

was color of title, it did not ripen into ownership by adverse possession. Ruby Barr is the only heir he claimed to have notified of his adverse claim. Appellee apparently had some clearing done at the time he had the young trees planted. There is no testimony that either the sale of the timber or the clearing was performed more than seven years prior to the suit. Nothing had been done previous to the sale of the timber that could be deemed notice to the other heirs that someone was claiming adversely to them.

This case is factually quite similar to *McGuire* v. *Wallis*, 231 Ark. 506, 330 S.W.2d 714 (1960). Wallis died in 1937 and was survived by a widow and eight adult children. Allie, one of the children, took possession of part of his father's land and held it until his death in 1945. Thereafter Clovis Wallis, son of Allie, took possession and claimed it until suit was filed in 1948. Clovis had been in actual possession since his father's death. The trial court found in favor of Clovis' adverse claim and this Court reversed. *The Court treated the grandson (Clovis) as a cotenant when it stated*: "It must be remembered at the outset that the possession of one tenant in common is presumed to be the possession of all and, further, that in view of the family relation stronger evidence of adverse possession is required in this case than in one where no such relation exists."

The dissent relies on *Watkins* v. *Johnson*, 237 Ark. 184, 372 S.W.2d 243 (1963) as controlling in this case. In *Watkins* a cotenant sold to a "stranger" (actually the son of the seller) who entered into exclusive possession under the deed. The lands were and continued to be fenced, with part in crops and part in pasture. This is not the case here, because the appellee did not enter into exclusive possession. *Watkins* is sound law, but has no application here.

Since color of title and payment of taxes alone are insufficient to ripen into ownership by adverse possession, the appellee never acquired title adverse to the other heirs. Therefore, the trial court decree is reversed as to the section 6 land. The decree is affirmed as to the section 7 land.

Affirmed in part, reversed in part and remanded.

HOLT, C.J., and HAYS and GLAZE, JJ., dissent.

TOM GLAZE, Justice, dissenting. I dissent from that part of

the majority opinion that reverses the trial court's decree quieting title to the surface rights of Section 6 in appellee, Albert W. Eason.

The majority cites several cases which I simply feel are not applicable to the situation before us. More importantly, however, I believe the majority is reversing the chancellor when the record clearly supports the holding he reached. Before analyzing the cases relied on by the majority, I will discuss first those relevant facts that I believe support the trial court's holding that title to Section 6 should be quieted in appellee, Albert Eason, because he is record title owner of it and held it adversely under color of title.

The property in dispute, Section 6, was originally owned by S. S. Eason, who died leaving fifteen heirs. Those heirs included Albert's father, John. The other heirs are appellants in this appeal. The taxes on Section 6 were delinquent in 1959 and in November 1962, the property was sold to H. M. McIver, an admitted stranger to the title. Albert subsequently paid McIver $250.00 for the property, but requested McIver deed it to his father, John, which was done on January 18, 1963. The next day, January 19, 1963, John deeded the property to Albert. John died later that same year.

After having been deeded the Section 6 property, Albert was assessed taxes on it and he commenced paying them in 1963; he did so annually up to the time he brought this quiet title action in 1982. Albert said that every time he contacted one of the appellants and this property was mentioned, he referred to the fact that his father and mother had deeded him this 80-acre tract. While two of the appellants denied any knowledge that Albert had claimed the property, Albert offered proof that belied such lack of knowledge. For example, appellant Ruby Barr testified Albert had never notified her that he claimed title to Section 6, but Albert undisputably refunded tax monies to Ruby's husband, Sherman, for taxes the Barrs mistakenly paid on Section 6 for the years 1963 and 1972. Albert first reimbursed the Barrs in November 1964, for the 1963 taxes, and then reimbursed them again in October 1973, for the 1972 taxes. Another instance reflecting appellants' knowledge that Albert was claiming Section 6 occurred when Albert was farming timber on the property and had difficulty in locating a buyer. He said J. B. Eason, one of

the appellants, had informed him of a man who would be willing to buy the timber, and when telling Albert this, Albert said J. B. claimed no interest in the timber but was merely acting as a friend. That testimony was not rebutted. In fact, J. D. Eason's wife, Myrtis, conceded at the trial below that her husband had told her timber had been cut on Section 6—an admission which tended to corroborate (or at least is consistent with) Albert's testimony concerning his conversation with J. B.

Finally, there is no dispute that the acreage in question was unimproved and unenclosed. John Dobbins, a U.S.D.A. Soil Conservation Service employee, testified the property was mostly culled hardwood with scattered pines and was good for tree farming. Dobbins said that Albert had made substantial improvements to the land which increased its value about $100.00 to $150.00 per acre.

Based upon the foregoing evidence, the chancellor was justified in finding Albert had acquired title to Section 6. *See* Ark. Stat. Ann. § 37-102 (Repl. 1962) (person who holds unimproved and unenclosed property under color of title and pays its taxes for at least seven years is deemed to be in possession); *see also* Ark. Stat. Ann. § 37-103 (Repl. 1962). The majority court asserts the chancellor was wrong, and, in support of its position, relies on cases I feel are not controlling or applicable to the situation posed here.

First, the majority cites *Zimmerman* v. *Franklin County Bank*, 194 Ark. 554, 105 S.W.2d 1074 (1937) for the general rule that a person who is in possession and receiving benefits from the property cannot acquire title by permitting the property to sell for taxes and then buying it at a tax sale. Here, Albert Eason was not in possession of Section 6, nor was he receiving benefits from it at the time the property went into tax default and was sold to McIver. Neither was he in possession nor was he receiving benefits when he paid McIver for the property, and requested McIver to convey title to Albert's father, John. In addition, the record in no way reflects that John possessed or received any benefits from Section 6 either before or during this time of tax sale or when he received title from McIver. The rule in *Zimmerman* simply does not apply to the facts in this case.

Even if we were to stretch the rule, so-to-speak, and infer

from the facts that John enjoyed some benefit from the property at the time it was sold for taxes and redeemed in his name, the most that situation would pose is whether these transactions or conveyances involved fraud. For example, in *Lewis* v. *Fidelity Savings & Trust Co.*, 207 Ark. 433, 181 S.W.2d 22 (1944), this court, quoting from *Renn* v. *Renn*, 207 Ark. 147, 179 S.W.2d 657 (1944), said: "Where property is allowed to forfeit for taxes, and then some member of the family (or other confederate) acquires a deed from the state or taxing agency, equity will examine the transaction to see if it was a fraudulent conveyance; and upon ascertaining such to be the fact, then the purchaser will be held a trustee, or the entire transaction will be held a redemption by the original owner." Here, the trial judge made no mention of fraud, not surprisingly so, because no one alleged or even suggested fraud when this cause was tried below. In sum, I must reach the result, based upon the record and facts before us, that the redemption rule related in *Zimmerman* cannot be used to defeat Albert Eason's claim to Section 6.

Next, the majority cites *Smith* v. *Smith*, 210 Ark. 251, 195 S.W.2d 45 (1946) and the rule that a redemption by one tenant in common or one of several cotenants inures to the benefit of all, in the absence of special circumstances or waiver. That rule is not applicable here either because Albert was not a cotenant or tenant in common. Of course, John, Albert's father, was a cotenant of the appellants. To again summarize the evidence, McIver purchased Section 6 at the tax sale, and later deeded it to John, a cotenant of appellants; John, a day after acquiring title to the property, then deeded it to Albert, who was not a cotenant, but the son of one. There is no need to reiterate what occurred after Albert obtained record title to the property except to say he paid its taxes for twenty-two years, improved and farmed it and apprised some of the appellants, at least, that his father and mother conveyed the property to him and he made claim to it. Based on this evidence, the trial judge, apparently resolving the doubts or credibility issues in Albert's favor, quieted title in him to Section 6. Again, appellants alleged no fraud on John's or Albert's behalf and the trial judge found none.

Finally, the majority cites *McGuire* v. *Wallis*, 231 Ark. 506, 330 S.W.2d 714 (1960) for the point that this court has on one occasion, at least, treated the son of a cotenant-heir as if he, too,

were a cotenant. That being so, the majority says the rule that "the possession of one tenant in common is presumed to be the possession of all" is applicable and that Albert merely held or possessed Section 6 for all heirs, *viz.*, the appellants. *McGuire*, of course, did not involve unimproved property or § 37-102, *supra*; but, more importantly, its holding turned on whether the son (Clovis) or his father (Allie—a cotenant) held the subject property adversely to the other heirs-cotenants. The *McGuire* court, in its review of the record, found no proof of any acts so as to charge the other heirs with knowledge of Clovis's (or Allie's) adverse claim. I submit that, clearly, is not true in the instant case, and the evidence I set forth earlier supports the conclusion that the appellants here did have knowledge of Albert's claim.

Another case, again not involving unimproved property or § 37-102, is *Watkins v. Johnson*, 237 Ark. 184, 372 S.W.2d 243 (1963), wherein this court correctly considered the situation where the son of a cotenant went into possession of disputed property. There, this court alluded to a long line of cases where we held when a cotenant executes a deed to a stranger to the title, describing the entire land, and such grantee enters into exclusive possession under the deed, then such deed constitutes color of title, and such entry commences the running of limitation in favor of the grantor and against all the other cotenants of the grantor. *See Landman v. Fincher*, 196 Ark. 609, 119 S.W.2d 521 (1938) and *Parsons v. Sharpe*, 102 Ark. 611, 145 S.W. 537 (1912). The *Watkins* court determined W. H. Johnson was a cotenant with the heirs of Lewis Watkins but that Johnson sold the parties' property in its entirety to his son, A. W. Johnson, who took possession of it and paid taxes on it. The court held that even though A. W. Johnson was a first cousin of the Watkins children, nevertheless A. W. Johnson was a "stranger to the title" because he was not a privy of the Watkins heirs. Consistent with the holding in *Watkins*, Albert, in the case at hand, clearly was a stranger to the title when his father conveyed all of the Section 6 property to him.

In conclusion, the majority indicates that Albert said that he did not know if the heirs (appellants) knew he claimed the property and that Ruby Barr was the only heir he claimed to have notified of his adverse claim. Actually, Albert was steadfast throughout his testimony that he had made known to appellants

that he claimed ownership to the property. After having said so earlier in his testimony, he was again asked, "Is there any doubt in your mind that the members of the second family (appellants) knew that you claimed ownership of that 80 (acres)?" Albert responded, "I don't think so. I don't see how it could be, but I can't answer the question. You will have to ask them, sir." Obviously, the chancellor believed Albert's testimony that appellants knew he claimed ownership and evidence exists in the record for him to have inferred and found as much. It is not within this court's province to reverse a trial judge by drawing a different inference unless the judge's finding was clearly erroneous. On this same point, Albert testified he had contacted other heirs regarding his claim to the property, and from the evidence, it is obvious appellants Ruby and Sherman Barr and J. B. and Myrtis Eason had some knowledge of Albert's claim. From the evidence, the chancellor had every right to infer more than Ruby Barr knew of Albert's claim.

In my opinion, the record clearly reflects that Albert acquired record and color of title to the disputed property and appellants had chargeable knowledge that he was holding the property adversely, claiming title and paying taxes on it. At the least, I am unable to say the chancellor was clearly wrong in so finding.

HOLT, C.J., and HAYS, J., join in this dissent.