Peoria MITCHELL *v.* Edward P. HAMMONS, M.D.

CA 89-466                                        792 S.W.2d 333

Court of Appeals of Arkansas
Division II
Opinion delivered June 20, 1990

182

*Marc I. Baretz,* for appellant.

*Sloan, Rubens, Peeples & Coleman,* by: *Gerald A. Coleman* and *Therese H. Green,* for appellee.

JOHN E. JENNINGS, Judge. This is an adverse possession case. Peoria Mitchell brought this action against Edward Hammons, alleging that she was the owner of an undivided one-half interest in a forty-acre tract in St. Francis County, Arkansas. She sought partition of the property and a decree quieting title. In response to the petition, Hammons asserted that he had acquired title by adverse possession and that Mitchell's claim was barred by laches. After hearing the testimony, the chancellor issued a thoughtful and extensive memorandum opinion containing separate findings of fact and conclusions of law. The chancellor held that Mitchell's claim was barred by adverse possession, laches, and estoppel. While the chancellor's findings of fact are clearly supported by the evidence, we agree with appellant's contention that his conclusions of law were in error and therefore reverse.

Although the record is somewhat sparse, the facts are virtually undisputed. Peoria Mitchell was the only child of Gordon and Mattie Young. She was born in 1923 in St. Francis

County, Arkansas, where her father, Gordon Young, and his brother, Buford Young, farmed a forty-acre tract. As a child, she lived on the farm with her parents. In the mid-1930's Mitchell's parents separated and she and her mother left the farm, although they continued to live in St. Francis County. In 1940 Gordon Young and Buford Young bought the forty-acre tract, taking title as tenants in common, and continued to farm the land. There was no evidence that Mitchell was aware of this purchase. Mitchell married one Jessie Gunn in 1942 and moved to Egypt, still in St. Francis County. In 1949, Mitchell and Gunn separated and Mitchell moved to Memphis, Tennessee.

In 1960 Mitchell went to St. Louis to visit her father, who was on his deathbed. Some time in the early 1960's, after the death of Gordon Young, Buford Young died. The chancellor found that Buford's widow, Roxie Young, apparently took control of the forty-acre tract after Buford's death and apparently paid the real estate taxes on it. In 1968 Roxie and their only son, Alfred, executed a deed conveying the forty-acre farm to themselves. The deed stated:

> THAT we, Roxie Young, surviving widow of Buford Young, and Alfred F. Young, sole heir at law of Buford Young, deceased, and Gordon Young, deceased, . . . hereby grant, bargain, sell, and convey unto Roxie Young [sic] as joint tenants with right of survivorship unto their heirs and assigns forever, the following lands. . .

> TO HAVE AND TO HOLD THE same unto the said Roxie Young and Alfred F. Young, as joint tenants with right of survivorship,. . .

Of course, the recital in the deed that Alfred Young was the sole heir at law of Gordon Young was untrue and the conclusion is inescapable that Roxie and Alfred knew it was untrue. The deed was duly recorded and fairly soon afterwards Alfred Young drowned.

In 1975 Mattie Young, Peoria Mitchell's mother, died. In 1979 Roxie Young, who now appeared to be the sole owner of the property based on the recital contained in the 1968 deed, leased the property to Millard Cummings. On September 8, 1981, she conveyed the property to Cummings by warranty deed. Cum-

mings made certain improvements on the property — he cleared fourteen acres of timber, leveled some of the land, and put in an irrigation well.

In 1982, Millard Cummings mortgaged his interest in the property to the Federal Land Bank. He subsequently defaulted on the loan, and after foreclosure the property was sold at public sale on January 27, 1988, to Edward Hammons, the appellee here. After the foreclosure sale, Peoria Mitchell learned that she might have an interest in the land and brought the present action on April 19, 1988. Hammons has been in possession of the property since January of 1988 and at the time of the hearing was renting the property to a tenant.

In examining the issue of adverse possession we begin with the familiar rule that the possession of one tenant in common is the possession of all. *Graham* v. *Inlow*, 302 Ark. 414, 790 S.W.2d 428, (1990); *Ueltzen* v. *Roe*, 242 Ark. 17, 411 S.W.2d 894 (1967); *Franklin* v. *Hempstead County Hunting Club*, 216 Ark. 927, 228 S.W.2d 65 (1950). A tenant in common is presumed to hold in recognition of the rights of his cotenants. *Baxter* v. *Young*, 229 Ark. 1035, 320 S.W.2d 640 (1959); *Gibbs* v. *Pace*, 207 Ark. 199, 179 S.W.2d 690 (1944). It has been said that the presumption continues until an actual ouster is shown. *Baxter, supra.* Since possession by a cotenant is not ordinarily adverse to other cotenants, each having an equal right to possession, a cotenant must give actual notice to other cotenants that his possession is adverse to their interests or commit sufficient acts of hostility so that their knowledge of his adverse claim may be presumed. *Hirsch* v. *Patterson*, 269 Ark. 532, 601 S.W.2d 879 (1980). In order for the possession of one tenant in common be adverse to that of his cotenants, knowledge of his adverse claim must be brought home to him directly or by such notorious acts of an unequivocal character that notice may be presumed. *Graham, supra; Barr* v. *Eason*, 292 Ark. 106, 728 S.W.2d 183 (1987) (citing *Zackery* v. *Warmack*, 213 Ark. 808, 212 S.W.2d 706 (1948)); *Harris* v. *Harris*, 225 Ark. 789, 285 S.W.2d 513 (1956). The statutory period of time for an adverse possession claim does not begin to run until such knowledge has been brought home to the other cotenants. *Hirsch, supra; Gibbs, supra.* There is no "hard and fast" rule by which the sufficiency of an adverse claim may be determined; courts generally look to the totality of the

circumstances and consider such factors as the relationship of the parties, their reasonable access to the property, kinship, and enumerable other factors to determine if non-possessory cotenants have been given sufficient warning that the status of a cotenant in possession has shifted from mutuality to hostility. *See Hirsch, supra; Ueltzen, supra; Linebarger* v. *Late*, 214 Ark. 278, 216 S.W.2d 56 (1948). When a tenant in common seeks to oust or dispossess the other tenants and turn his occupancy into an adverse possession and thus acquire the entire estate by lapse of time under the statute of limitations, he must show when knowledge of such adverse claim or of his intention to so hold was brought home to them, for it is only from that time that his holding will be adverse. *Gibbs* v. *Pace*, 207 Ark. 199, 179 S.W.2d 690 (1944); *Singer* v. *Naron*, 99 Ark. 446, 138 S.W. 958 (1911), *cited in Ueltzen* v. *Roe*, 242 Ark. 17, 29, 411 S.W.2d 894, 900 (1967) (Fogleman, J., dissenting). When, as here, there is a family relation between cotenants, stronger evidence of adverse possession is required. *Ueltzen* v. *Roe*, 242 Ark. 17, 411 S.W.2d 894 (1967); *McGuire* v. *Wallis*, 231 Ark. 506, 330 S.W.2d 714 (1960); *Morgan* v. *Morgan*, 15 Ark. App. 35, 688 S.W.2d 953 (1985).

At the death of her father, Peoria Mitchell became the owner of an undivided one-half interest in the property. Her cotenants were, in order, Buford Young, then Alfred Young at Buford's death, then Alfred and Roxie Young by virtue of the 1968 deed, and finally Roxie Young after the death of Alfred. There is no evidence that any of her relatives gave actual notice of their intent to hold adversely to her or that she had actual knowledge of any hostile claim on their part. The question then becomes whether Buford, Roxie, or Alfred committed "sufficient acts of hostility" so that her knowledge of their adverse claims may be presumed. *See Hirsch, supra; Johnson* v. *Johnson*, 250 Ark. 457, 465 S.W.2d 309 (1971). As far as Buford Young and his immediate family are concerned, it appears that from the date of Gordon Young's death until the conveyance by Roxie Young to Millard Cummings they were in actual possession of the property, and it also appears, as the chancellor found, that they paid the taxes thereon. There is also the deed containing the false recital or heirship from Roxie and Alfred to themselves. Finally, there is the fact that Roxie Young leased the property from 1979 until

1981 to Millard Cummings. When these facts are considered together, we think that they are not "so notorious that notice may be presumed." *Harris* v. *Harris*, 225 Ark. 789, 285 S.W.2d 513 (1956); *Smith* v. *Kappler*, 220 Ark. 10, 245 S.W.2d 809 (1952). A cotenant is not expected to check the records constantly to determine whether instruments affecting title have been executed. *See Tennison* v. *Carroll*, 219 Ark. 658, 243 S.W.2d 944 (1951).

We conclude that at least until the conveyance from Roxie Young to Millard Cummings on September 8, 1981, the seven year statute of limitations had not yet begun to run. At that time, however, the statute did begin to run against Peoria Mitchell's claim. When a cotenant executes a deed to a stranger to the title, purporting to convey the entire property, and the grantee enters into exclusive possession under such deed, then the deed constitutes color of title, and the grantee's entry commences the running of the statute of limitation in favor of the grantee and against all the other cotenants of the grantor. *Watkins* v. *Johnson*, 237 Ark. 184, 372 S.W.2d 243 (1963); *Ulrich* v. *Coleman*, 218 Ark. 236, 235 S.W.2d 868 (1951); *Jackson* v. *Cole*, 146 Ark. 565, 226 S.W. 513 (1920). It follows that acts of ownership on the part of such a grantee must necessarily be adverse to any other part owner, even though the latter had no actual notice of the adverse character of the possession. *Jackson* v. *Cole, supra.* In the case at bar, because the deed to Cummings was executed in September of 1981 and suit was filed by the appellant in April of 1988, the seven year statute of limitations had not run. *See* Ark. Code Ann. § 18-61-101 (1987).

In reaching the contrary conclusion, the chancellor relied primarily on our opinion in *Morgan* v. *Morgan*, 15 Ark. App. 35, 688 S.W.2d 953 (1985), in which we quoted from *Ueltzen*:

Our courts have ordinarily held that to constitute estoppel, adverse possession or laches with reference to a cotenant, that no one or two specific acts, and sometime even more, necessarily, of themselves amount to a disseisin, but the following each are items to be considered in determining whether the possession is adverse, or the individual is estopped or guilty of laches and they include such acts as (a) possession of the property; (2) payment of

taxes; (3) enjoyment of rents and profits; (4) making of improvements (particularly of a substantial nature); (5) payments of insurance made payable to himself; (6) holding possession of lands for a long period of time, such as 30 years; (7) treating property as one's own; (8) selling timber; (9) executing leases; (10) assessment of property in one's own name; (11) selling crops; (12) the execution, delivery, and recording of a deed by one cotenant which purports to convey the entire property; and (13) generally treating property as his own.

The chancellor correctly recognized that the stated factors were not all inclusive. Indeed, as the court said in *Ueltzen*:

What in one case would be sufficient as a warning might not be enough in another. Relationship of the parties, their reasonable access to the property and opportunity or necessity for dealing with it, their right to rely upon conduct and assurances of the tenant in possession, kinship, business transactions directly or incidentally touching the primary subject matter, silence when one should have spoken, natural inferences arising from indifference—these and other means of conveying or concealing intent may be important in a particular case, but not controlling in another; . . . There can, therefore, be no "open and shut" rule by which purpose can be measured.

*Ueltzen* v. *Roe*, 242 Ark. at 21 (quoting *Linebarger* v. *Late*, 214 Ark. at 282). Rather than focusing upon the time from which the statute began to run, the chancellor considered the duration of possession by the Buford Young family together with the improvements made by Millard Cummings. It is with this method of analysis that we must disagree. Furthermore, both *Morgan* and *Ueltzen* are distinguishable on their facts from the case at bar. In *Ueltzen*, the court found it significant that the cotenants out of possession visited the property and had actual knowledge that improvements were being made. Similarly in *Morgan*, we found it particularly significant that the out of possession cotenants had actual knowledge of certain acts of ownership. *Morgan*, 15 Ark. App. at 40. To summarize, we conclude that the actions of Buford Young and his family were not such as to begin the running of the seven year statute of limitations, that the statute commenced to

run as of the date of the conveyance from Roxie Young to Millard Cummings, and that suit was filed by the appellant within seven years of the date of that conveyance.

Nor can we agree with the conclusion that the appellant's claim was barred by the doctrine of laches or the principle of estoppel.[1] On this issue the chancellor again relied on *Ueltzen*:

> Laches or estoppel, is not brought into being merely by delay, but by delay that works a disadvantage to another. So long as the parties are in the same condition, it matters little whether one presses a right promptly or slowly within limits allowed by law. But where, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith become so changed that he cannot be restored to his former state, if the right be enforced, delay becomes inequitable, and operates as estoppel against the asserted right. This disadvantage may come from loss of evidence, change of title, intervention of equities, and other causes, the making of substantial improvements to the land, and other causes, for where the court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief.

The court also relied on *Sanders* v. *Flenniken*, 180 Ark. 303, 21 S.W.2d 847 (1929):

> [W]hen the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known to him were such as to put the duty of inquiry upon a man of ordinary intelligence.

The chancellor noted that appellant made no attempt to find out what property, if any, her father owned at his death. He

---

[1] Because estoppel was not pled and because we believe the chancellor used the word only in the sense that the doctrine of laches is said to be "a species of estoppel," *see, e.g., Beshear* v. *Ahrens*, 289 Ark. 57, 709 S.W.2d 60 (1986), and *Franklin* v. *Hempstead County Hunting Club*, 216 Ark. 927, 228 S.W.2d 65 (1950), we do not separately address the issue. The chancellor was probably also influenced by language in our decision in *Morgan* and that of the supreme court in *Ueltzen*, which lump the two concepts together with adverse possession.

held that she was chargeable with knowledge of her father's interest in the land because "ordinary inquiry would have given her actual knowledge." Under the exact circumstances presented we cannot agree that Mitchell's claim was barred by laches. In determining whether the doctrine is applicable, all the facts and circumstances of the case must be considered. *See Inman, supra; Ueltzen, supra.* She was between nine and thirteen years of age when she moved with her mother from the farm, and at that time her father owned no interest in the property. The chancellor found that she did not know where the property was, and this finding is supported by the evidence. She has lived in Memphis since 1949. We can understand her apparent failure to inquire of her father about the extent of his property when she visited him in St. Louis in 1960. The apparently collusive deed executed by Roxie and Alfred Young is another factor weighing against the application of the doctrine of laches. *See Inman v. Quirey,* 128 Ark. 605, 194 S.W. 858 (1917). We are persuaded that the doctrine should not be applied in the case at bar.

*Ueltzen* and *Sanders* involved factors not present here. In *Ueltzen,* the court noted that the out-of-possession cotenants had visited the property and had known that valuable improvements were being made for some thirty years and yet "sat idly by and made no claim." In *Sanders,* it appears that all of the out-of-possession cotenants resided near the subject property. Some of them lived on the property at the time it was sold at foreclosure sale in 1907. In 1922, they discussed their possible interest in the land with a lawyer, but delayed bringing suit until 1925. In the case at bar, it is undisputed that appellant brought suit promptly upon learning that she might have an interest in the St. Francis County property.

Our conclusion is that appellant's claim is not barred by adverse possession, laches, or estoppel and we reverse and remand.

Reversed and remanded.

COOPER, J., agrees.

CORBIN, C.J., concurs.