John Henry HOPPER and Betty J. Hopper *v.*
Tom DANIEL; Mrs. Tom Daniel, *his wife*;
Ed Daniel; Mrs. Ed Daniel, *his wife*;
Debra Puckett, *a single person*;
James C. Taylor; Mrs. James C. Taylor,
*his wife*; Ann Murray, *unremarried widow
of Garner Murray, deceased*;
Pat Murray; Mrs. Pat Murray, *his wife*;
Bertha Pearl Murray Keys, *a widow*;
Kathleen Kluis, *a single person*;
Unknown Heirs of Augustus Hopper
and Martha M. Hopper, *deceased*

CA 00-464                                             38 S.W.3d 370

Court of Appeals of Arkansas
Divisions I and IV
Opinion delivered February 7, 2001

*Harrell & Lindsey, P.A.*, by: *Searcy W. Harrell, Jr.*, for appellants.

*Terry Sullivan*, for appellees Mr. and Mrs. Tom Daniel and Mr. and Mrs. Ed Daniel.

*Farrar, Reis, Rowe, Nicolosi & Williams*, by: *Adam Williams*, for appellees Mr. and Mrs. Larry Keys.

JOHN F. STROUD, JR., Chief Judge. This appeal involves a quiet-title action, with an alternative prayer for partition, that was brought by appellants John Henry Hopper and his wife Betty J. Hopper. John Hopper is a grandson of Augustus and Martha Hopper, who acquired title to a combined total of 120 acres in Yell County, the property in question, in the 1800s. Appellant Hopper's father, Lawrence, was one of seven children born to Augustus and Martha. In his action, appellant John Hopper contended that his father had adversely possessed the property from the time of Martha's death in 1947 until his own death in 1975; that he, appellant Hopper, continued in adverse possession after acquiring the quitclaim deed from his father; and that, through tacking, there had been fifty years of adverse possession.

Appellees are those heirs of Lawrence's siblings from whom appellant John Hopper was not able to acquire quitclaim deeds covering their inherited interests in the property. Appellees' interests in the property are divided as follows: 1/6 is held by "the Daniel heirs;" 1/6 by Larry Keys' widow, Bertha Pearl Murray Keys; 1/6 by heirs who were never located but were served by publication; and 1/36 by heirs who were served with process but defaulted. The chancellor held that appellant Hopper had not sustained his burden of proving that he was entitled to the property in question under the doctrine of adverse possession. Consequently, the chancellor ordered partition of the property. In addition, the chancellor limited his award of attorney's fees for the work of appellants' attorney on the partition action to $2,000. We affirm.

In order to understand the issues involved in this case, we analyze it in historical context. Augustus Hopper died in 1902 and Martha Hopper died in 1947, having never remarried. Their seven children survived them, but one child subsequently died without children. Of the six remaining children of Augustus and Martha, five moved away from Yell County, with two remaining in Arkansas, and three moving to Oklahoma, New Mexico, and California. The only child of Augustus and Martha that remained on the farm in Yell County was appellant John Hopper's father, Lawrence. Lawrence cared for Martha until her death in 1947, and he continued to live on the farm until his own death in 1975. Prior to his death, he executed a quitclaim deed covering the property in ques-

tion to appellant John Hopper, his only surviving heir. He also left all of his property to appellant John Hopper by his will.

In 1996, appellant John Hopper had the title to the 120 acres examined and discovered that his father never held record title to the property because he never acquired title from his parents, Augustus and Martha. The survivor of the two, Martha, who held record title, died intestate. Accordingly, appellant began trying to acquire quitclaim deeds from those heirs of his father's siblings that he could locate. As a result of those efforts, he acquired title to a 34/72 interest in the 120 acres, and then brought the instant action against appellees. He now raises four points of appeal: 1) the court erred in excluding testimony about a lost letter, 2) the court erred in finding that the appellant must give "actual notice" to co-tenants in order to obtain title by adverse possession, 3) the court's decision was against the preponderance of the evidence, and 4) the court abused its discretion when it only awarded appellant a $2,000 attorney's fee.

*1) The court erred in excluding testimony about a lost letter.*

The trial court sustained an objection to testimony by appellant John Hopper to the effect that shortly after his father died in 1975, he received a letter from Ed Daniel that suggested the land be appraised and sold and divided; that he never heard further from Mr. Daniel or any other member of the family; and that his refusal to comply with Daniel's request supported his position that Ed Daniel had notice that he was holding the property adversely. Appellant testified that he gave the letter to his father's attorney and never saw it again; that Ed Daniel is now deceased; and that some of Ed Daniels's heirs are defendants [appellees] in this case. We find no error in the court's refusal to allow the testimony.

■ Appellant John Hopper's recollection of the contents of the 1975 letter constituted hearsay evidence, which was properly excluded under Rule 802 of the Arkansas Rules of Evidence. Appellant contends that the original letter was either lost, destroyed, or not obtainable, and therefore should have been admissible pursuant to Ark. Rule Evid. 1004, which provides that an original is not required in certain circumstances. We disagree. First, appellant's testimony did not establish that the original was lost or otherwise unobtainable, just that he gave it to his father's lawyer and never saw it again. Second, subsection 4 of Rule 1004 provides that "The

original is not required, and other evidence of the contents of a writing, . . . is admissible if: . . . [t]he writing, . . . is not closely related to a controlling issue." Here, the presence or absence of notice to the other co-tenants was a controlling issue. The trial court did not err in excluding the testimony.

*2) The court erred in finding that the appellant must give "actual notice" to co-tenants in order to obtain title by adverse possession.*

The third and fourth numbered paragraphs of the April 15, 1998, decree issued by the chancellor in this case provide:

> 3. The Court does not feel that the Plaintiff has sustained his burden of proof to show that he is entitled to the subject property under the doctrine of adverse possession. It is undisputed that the Plaintiff, John Henry Hopper, is a co-tenant with the Defendants *and case law is clear that when there is a family relation between co-tenants that a stronger evidence of adverse possession is required when a tenant in common attempts to turn his occupancy into adverse possession and he must show knowledge of the adverse claim or his intentions to so hold against the other co-tenants. I do not find that this has been done in the instant case.*

> 4. It is undisputed that the Plaintiff owns property in his own right adjacent to the property he is claiming by adverse possession. As the Court recalls the Plaintiff's testimony was that he did not know the boundary line between the two farms and there was no evidence regarding the accounting prepared by the Plaintiff, regarding his income and profits on the farm, as to differentiate between the activities of the Plaintiff on his own farm and the property in question. *The Court further finds no evidence of any actual notice that the Plaintiff gave to the Defendants and their predecessors in title which would merit the Plaintiff prevailing on his argument of adverse possession.* Consequently, the Plaintiffs claim as to ownership of the subject property, under the doctrine of adverse possession, is denied and dismissed.

(Emphasis added.) Appellants contend that the chancellor erred in finding that they were required to give "actual notice" to the other co-tenants in order to obtain title by adverse possession. We do not believe the chancellor so found.

■ Although paragraphs two and three are perhaps inartfully written, we believe that when they are read together, it is clear that the chancellor did not base his decision solely on appellants' failure to give actual notice to the other co-tenants. Rather, in the third paragraph, the chancellor explained that stronger evidence of

adverse possession is required when there is a family relation among the co-tenants, and that "when a tenant in common attempts to turn his occupancy into adverse possession he must show knowledge of the adverse claim *or* his intentions to so hold against the other co-tenants." (Emphasis added.) That is, we believe that the chancellor's sentence in this regard can be interpreted to say that a co-tenant who is attempting to show that his occupancy of the property has changed to that of adverse possession must show *either* that the other co-tenants had actual knowledge of the adverse claim *or* that his intentions to so hold were sufficiently conveyed to the other co-tenants by his actions. The chancellor concluded the paragraph by stating that he did "not find that this has been done in the instant case." Then, in the fourth paragraph, the chancellor finds in pertinent part that there was "no evidence of any *actual notice* that the Plaintiff gave to the Defendants and their predecessors in title which would merit the Plaintiff prevailing on his argument of adverse possession." (Emphasis added.) In short, we find that the chancellor applied the proper law in making his determination as to whether appellants had established adverse possession of the property in question, and did not limit his determination solely to whether appellant had given "actual notice" of his claim of adverse possession to the other co-tenants.

### 3) The court's decision was against the preponderance of the evidence.

■■■ The possession of one tenant in common is the possession of all. *Mitchell v. Hammons,* 31 Ark. App. 180, 792 S.W.2d 333 (1990). A tenant in common is presumed to hold in recognition of the rights of his co-tenants. *Id.* It has been said that the presumption continues until an actual ouster is shown. *Id.* Since possession by a co-tenant is not ordinarily adverse to other co-tenants, each having an equal right to possession, a co-tenant must give actual notice to other co-tenants that his possession is adverse to their interests or commit sufficient acts of hostility so that their knowledge of his adverse claim may be presumed. *Id.* In order for the possession of one tenant in common to be adverse to that of his co-tenants, knowledge of his adverse claim must be brought home to him directly or by such notorious acts of an unequivocal character that notice may be presumed. *Id.* The statutory period of time for an adverse-possession claim does not begin to run until such knowledge has been brought home to the other co-tenants. *Id.* There is no hard and fast rule by which the sufficiency of an adverse

claim may be determined; courts generally look to the totality of the circumstances and consider such factors as the relationship of the parties, their reasonable access to the property, kinship, and innumerable other factors to determine if nonpossessory co-tenants have been given sufficient warning that the status of a co-tenant in possession has shifted from mutuality to hostility. *Id.* When a tenant in common seeks to oust or dispossess the other tenants and turn his occupancy into adverse possession and thus acquire the entire estate by lapse of time under the statute of limitations, he must show when knowledge of such adverse claim or of his intention to so hold was brought home to them, for it is only from that time that his holding will be adverse. *Id.* When there is a family relation between co-tenants, stronger evidence of adverse possession is required. *Id.*

▇ In making their argument under this point, appellants rely upon the cases of *Morgan v. Morgan,* 15 Ark. App. 35, 688 S.W.2d 953 (1985), and *Ueltzen v. Roe,* 242 Ark. 17, 411 S.W.2d 894 (1967). They summarize the evidence in the instant case that they contend supports the factors set forth in *Morgan* and *Ueltzen* that may be considered in determining whether a person's conduct constitutes sufficient notice that he or she is claiming property by adverse possession. However, as in *Mitchell v. Hammons,* 31 Ark. App. 180, 792 S.W.2d 333 (1990), and in *Wood v. Wood,* 51 Ark. App. 47, 908 S.W.2d 96 (1995), the facts of the instant case are distinguishable from *Morgan* and *Ueltzen, supra,* because, here, the out-of-possession co-tenants did not regularly visit the property in question, nor did they have actual knowledge of any improvements claimed by appellants.

▇ Moreover, appellant's testimony that the property was assessed in his name does not satisfy the requirements of *Mitchell* or *Woods, supra.* The recordation of a quitclaim deed from his father would normally cause such a change of assessment because tax assessors do not purport to determine record title. Thereafter, the payment of taxes, sale of timber, appearance before a board of equalization to attempt a reduction in property taxes, or a lease of the land or minerals (short of a drilling title opinion prior to the drilling of a well) all routinely flow from the tax assessment and do not bring home to an out-of-state co-tenant knowledge of hostile acts.

*4) The court abused its discretion when
it only awarded appellant a $2,000 attorney's fee.*

For their last point, appellants contend that the chancellor abused his discretion in limiting the attorney's fee award to $2,000 because 43.75 hours "related solely to the partition part of this case [and] [m]ost of the time was related to trying to locate these heirs . . . [a]ll of whom were missing." We find no abuse of discretion.

▆▆ Arkansas Code Annotated section 18-60-419 (1987), provides in pertinent part:

> (b) Where judgment is rendered by a court of this state for partition of realty in kind, or for the sale of realty and partition of the proceeds of the sale, the court in assessing a reasonable fee to be allowed the attorney bringing the action *shall consider only those services performed by the attorney requesting a fee which are of common benefit to all parties. The court shall assess no fee for services which benefit only one (1) party, such as services necessary for the preparation and trial of contested issues of title* or services for which payment has been made by the agreement of the parties.

(Emphasis added.) In his letter opinion, the chancellor explained:

> An examination of the case in its entirety reflects that the [appellants] have at all times tried this case as a quiet title case or, in the alternative have attempted to establish title to the property in question through adverse possession, which would result in the property in question being vested totally in [appellants]. This would obviously be of no benefit to any of the other heirs in the case as they would receive nothing.

In addition to the above explanation, we note that the time spent in searching for the missing heirs was as necessary for the quiet-title and adverse-possession actions as it was for the alternate prayer for partition. In short, our review of the record supports the chancellor's assessment, and we do not find that the chancellor's limitation of the award was arbitrary or groundless.

Affirmed.

HART, JENNINGS, ROBBINS, and NEAL, JJ., agree.

BIRD, J., dissents.

SAM BIRD, Judge, dissenting.  I respectfully dissent from the opinion affirming the chancellor's decision in this case.  I cannot agree that the chancellor applied the proper law and that he did not limit his determination solely to finding whether appellees were required to have "actual knowledge" of appellants' adverse claim.  Further, I would hold that limiting fees for appellants' attorney to $2000 was an abuse of the chancellor's discretion and was contrary to law.

The majority has concluded that, although the chancellor's order was "inartfully written," he apparently intended to say that he denied Hopper's claim of adverse possession *both* because there was "no evidence of any actual notice" that Hopper gave to the appellees and their predecessors in title to merit Hopper's prevailing on his claim of adverse possession, *and* because Hopper's acts of hostility were insufficient to put appellees on notice that he was claiming title to the land by adverse possession.  While I believe that the majority is generous in its description of the chancellor's decree as inartful, I believe that the majority has been even more generous in its interpretation of what the chancellor meant.  It is clear to me that the chancellor based his decision to deny Hopper's claim of adverse possession solely upon the premise that actual notice of his claim was required to be given, but was not.  However, without regard for whether the chancellor based his decision upon both the lack of actual notice and the insufficiency of his acts of hostility, I believe that the chancellor's finding that Hopper's acts of hostility were insufficient is clearly erroneous.

While I recognize the heavy burden on a tenant in common to prove adverse possession against other blood-related tenants in common, the law does not render such a claim impossible.  Notwithstanding the majority's strained interpretation of the chancellor's decree, the chancellor held that because Hopper failed to prove *actual* notice to the other tenants in common, his claim of adverse possession failed.  However, the cases do not hold that for a tenant in common to prevail on a claim of adverse possession against a blood-related tenant in common, the plaintiff must give actual notice of his claim.  As the majority observes, to prevail on a claim of adverse possession, a plaintiff tenant in common must *either* give actual notice of his claim *or* "commit sufficient acts of hostility so that their knowledge of his adverse possession is presumed."  *Dillard v. Pickler*, 68 Ark. App. 256, 6 S.W.3d 128 (1999); *see also Hirsch v. Patterson*, 269 Ark. 532, 601 S.W.2d 879 (1980); *Ueltzen v. Roe*, 242

Ark. 17, 411 S.W.2d 894 (1967); *McGuire v. Wallis*, 231 Ark. 506, 330 S.W.2d 714 (1960); *Wood v. Wood*, 51 Ark. App 47, 908 S.W.2d 96 (1995); and *Welder v. Wiggs*, 31 Ark. App. 163, 790 S.W.2d 913 (1990). Furthermore, in *Welder v. Wiggs, supra,* we held both that a landowner (who, admittedly, was not a blood relative of the adverse claimant) had a duty to keep herself informed as to the adverse occupancy of her property, and that actual notice to an uninformed tenant of a claim of adverse possession is not essential to the success of the claimant. I am aware of no legal authority, nor can I perceive of any logical reason, why a blood-related tenant in common should be relieved from the same duty. In the case at bar, there is no evidence that any of the appellees knew or sought to discover whether they had any claim to an interest in the land here involved until Hopper's action was initiated. More importantly, there is no evidence that any of the appellees or their predecessors in title inquired, over a period of more than fifty years, whether they had any liabilities for the taxes, assessments, or other expenses that necessarily accompany the ownership of an interest in land in this state.

In the case at bar, Hopper lived on the land with his father from the time he was born in 1923 until he graduated from high school in 1941. He then went off to college, but his studies were interrupted by three years in the Navy during World War II. After the war, he completed his education and spent a career teaching and working until he retired in 1979. Hopper's father, Lawrence, was in sole actual possession of the land from 1947, when his mother died, until his death in 1975. During that time, Lawrence exercised all incidents of ownership over the land, including possession, tax payments, receiving rents and profits, and the construction and maintenance of improvements. Lawrence's sole income during his lifetime was derived from the land. Hopper acquired his title in the land by quitclaim deed from Lawrence sometime prior to 1975. From that time forward, Hopper was in sole possession of the land; the land was assessed only in his name; he paid all the taxes and assessments on the land (even appearing before the equalization board to get the taxes reduced); he retained all the rents and profits from the land (including proceeds from rental, oil and gas leases, and timber sales); he made permanent improvements by clearing land and planting pine trees; and he was believed by his neighbors to be the sole owner, and generally treated the land as his own because he justifiably believed that he was.

We have held that the acts of ownership exercised by one claiming to be the owner of land are ordinarily sufficient if they are of such a nature one would exercise over his own land and would not exercise over the land of another. *Dillard v. Pickler, supra.* If the above-described acts by Lawrence and Hopper are not sufficient acts of hostility from which knowledge of an adverse claim can be presumed, I do not know of any evidence that would qualify.

While Hopper justifiably believed himself to be the sole owner of the land for almost twenty-five years, the appellees had no knowledge whatsoever and made no attempt to inquire whether they had an interest in the land. In *Welder v. Wiggs, supra,* we held that where one claimed title to land under color of title, he need not give notice of his adverse claim to others residing in distant places about whose existence, whereabouts, or claims he is unaware. The majority opinion does not explain how one in possession of land, believing himself to be the sole owner thereof, gives actual notice of a claim of adverse possession to putative tenants in common about whom he is unaware. Another impractical result of the majority's decision is pointed out by appellant: he notes that an undivided one-sixth interest in the land is subject to the claim or claims of heirs whose identities and whereabouts are still unknown, and whose interest(s) in the proceeds from the partition sale will eventually escheat to the state because Hopper has not provided these unknown persons with actual notice.

On the issue of attorney's fees, I also believe that the chancellor's award was an abuse of discretion and contrary to the law. After the chancellor decided that Hopper had failed in his attempt to establish his claim of adverse possession, he granted Hopper's alternative prayer for partition of the land involved. Arkansas Code Annotated section 18-16-419(a) (1987) requires the court in land-partition cases to award a reasonable fee to the attorney bringing the suit. Section 18-16-419(b) provides that in assessing such a fee, the court shall consider only services of the attorney that are of common benefit to all parties.

At the hearing on the attorney's fee, Searcy W. Harrell Jr. stated that he spent 43.75 hours on the partition portion of the case. An examination of the pleadings alone reveals the vast amount of work that must have been involved in reconstructing the Hopper family tree and in obtaining actual or constructive service of process on them. Without stating any reason other than that "it becomes a

real problem to determine when the plaintiff's attorney quit working for his client and began working for the owners," the chancellor awarded only a $2,000 fee. This statement by the chancellor illustrates his misunderstanding of Ark. Code Ann. § 18-60-419(b), which permits compensation to the attorney bringing the suit for services that are of common benefit to all parties. Harrell was expected and required by ethical considerations to represent only the interests of his client. It is when the attorney's pursuit of his client's interests results in a common benefit to all the parties that the attorney bringing the suit is entitled to be compensated for those services from the proceeds of the partition sale. The fact that Hopper also benefitted from Harrell's services, along with the other co-tenants, is not a permissible reason to deny compensation to the attorney for those services.

In concluding that the record supports the chancellor's fee award, the majority opinion notes that "the time spent in searching for the missing heirs was as necessary for the quiet-title action and adverse-possession action as it was for the alternate prayer for partition." This statement indicates that the majority suffers from the same misunderstanding of the meaning of section 18-60-419(b) as did the chancellor. The very fact that Harrell's services were necessary for both the primary and alternative branches of the lawsuit is what justifies a fee for those services to the attorney bringing the partition action. Under the majority's theory, appellees' attorneys may benefit from Harrell's work that inured to their benefit without paying anything for it. This is what is sought to be prevented by section 18-60-419.

For his 43.75 hours devoted to services that inured to the common benefit of all the parties to this action, Mr. Harrell should be paid at least $5,000 from the proceeds of the partition sale. One hundred twenty-five dollars per hour is not an unreasonable rate of compensation for an attorney admitted to the bar in 1964.